## SAN FRANCISCO CITY AND COUNTY v. LE ROY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 878. Submitted January 19, 1891. — Decided March 2, 1891.

The attorney of the city and county of San Francisco has no authority to relinquish rights reserved for the benefit of the public by the Van Ness ordinance, the city and county having succeeded to the property and become subject to the liabilities of the city.

The confirmation of the pueblo lands to San Francisco was in trust for the benefit of lot-holders, under grants from the pueblo, town or city of San Francisco, or other competent authority, and, as to the residue, in trust for the benefit of the inhabitants of the city; and the title of the city rests upon the decree of the court, recognizing its title to the four square leagues and establishing their boundaries, and the confirmatory acts of Congress.

The exercise of this trust, as directed by the Van Ness ordinance, was authorized both by the legislature of the State and by act of the Congress of the United States.

That ordinance having reserved from the grant all lands then occupied or set apart for public squares, streets and sites for school houses, city hall and other buildings belonging to the corporation, a decree in a suit against the city and county to quiet a title derived through the ordinance should except from its operation the lands thus reserved, unless the fact that there were no such reservations be proved in the case by the public records of the city and county.

The swamp land act of 1850, 9 Stat. 519, c. 84, was not intended to apply to lands held by the United States, charged with equitable claims of others which the United States were bound by treaty to protect, and consequently does not affect the pueblo lands which were acquired by the pueblo before its passage.

It is doubtful whether there were any lands within the limits of the pueblo which could be considered to be tide-lands; but whether there were or not, the duty and the power of the United States under the treaty, to protect the claims of the city of San Francisco as successor to the pueblo, were superior to any subsequently acquired rights or claims of California over tide-lands.

The tide-lands which passed to California on its admission were not those occasionally affected by the tide, but those over which tide-water flowed so continuously as to prevent their use and occupation.

THIS was a suit in equity against the city and county of San Francisco, a municipal corporation of California, to quiet

the title of the plaintiffs below, the defendants in error here, to certain real property within the limits of that municipality, against the alleged claim of the corporation to an adverse estate therein. The plaintiffs were citizens of France. The defendant, as a corporation of California, must be treated, for purposes of jurisdiction, as a citizen of that State.

The bill alleged that the plaintiffs were seized and possessed in fee simple absolute of certain real property in the city and county of San Francisco, which was particularly described, and that they and their predecessors had been thus seized and possessed for more than ten years; that the defendant set up some claim of title to the property, or to some portion thereof, adversely to the plaintiffs, which claim was without right or justice and unfounded in law or equity, and had assumed to make surveys within the limits of the land; mark out lines of streets; subdivide a portion of the property into lots; and make a map thereof; and that it threatened to sell such subdivisions and lots and open such streets, and in divers other ways assumed to exercise acts of ownership over the property, to the slandering and disquieting of plaintiff's title, the depreciation of its market value, and the hindrance and prevention of its sale or use, to the manifest injury, loss and detriment of the plaintiffs.

They further averred that they deraigned title to all but a small portion of the property, by divers mesne conveyances from William J. Shaw, who, on the 28th of March, 1861, commenced a suit in the District Court of the Twelfth Judicial District in and for the said city and county of San Francisco, against the defendant herein, to quiet his title to the land described in his complaint in that suit; that the claim of the defendant might be determined and the title of the plaintiff therein (the said Shaw) be established and declared valid, and that it might be decided that the defendant had no title, claim and interest in the land; that the said defendant was served with summons and appeared by attorney, and such proceedings were afterwards had in the suit that on the 5th of February, 1862, the court entered its final judgment and decree therein, whereby it adjudged that the claim of the

defendant to the premises was invalid and void, that the title
of the plaintiff therein was valid and sufficient as against the
defendant and against all persons claiming through or under
the defendant, and that all such persons should be forever
barred and restrained from asserting any estate or title or
interest in the premises or any part thereof; that the said
judgment and decree in favor of Mr. Shaw still remained in
full force, never having been appealed from, reversed or
vacated; and they insisted that by it the defendant was es-
topped from claiming or pretending to any right, title or
interest in the lands therein described.

The plaintiffs, therefore, prayed that the defendant might
answer the bill and set forth whatever right, title or interest
it might have in the real property in relation to which the
bill was filed, or in any part thereof, to the end that the court
might determine upon its validity and that it might be ad-
judged and decreed that the plaintiffs were the owners of the
property and that the defendant had no right, title or interest
therein either in law or equity.

The defendant appeared by its attorney and filed its answer,
in which it denied upon information and belief the allegations
of the bill, and averred in like manner that the defendant was
and had been for more than ten years last past continuously
the owner in fee and possessed of the described premises.

The answer also averred, in the same way, that the plain-
tiffs ought not to maintain the suit, because neither they nor
their predecessor or grantors, or any of them, were seized or
possessed of the premises or any part thereof within five
years next before the filing of their bill; but, on the contrary,
that the defendant had been during all that time in the com-
plete, open and notorious possession of the premises, claiming
title to them in good faith and adversely to the whole world.

A general replication to the answer having been filed, proofs
were taken, and upon the pleadings and proofs a decree was
passed for the plaintiffs, adjudging that the plaintiffs were
then, and had been since the 26th of October, 1883, the day
on which the bill was filed, the owners and seized in fee
simple of the premises described in the complaint, and that

the defendant had no estate, right, title or interest therein, or to any part thereof, and adjudging that the defendant and all persons claiming under it be forever barred and enjoined from asserting any right or interest in the premises.

From this decree an appeal was taken to this court by the defendant. Before the decree was entered, one of the plaintiffs, Victor Le Roy, died, and his title and interest in the premises described in the bill of complaint passed to René de Tocqueville, who is a citizen of the Republic of France, and by consent of counsel he was substituted in the place of the deceased as a party plaintiff.

*Mr. George Flournoy* for appellant.

*Mr. Evans S. Pillsbury* and *Mr. Gordon Blanding* for appellees.

Mr. Justice Field, after making the above statement, delivered the opinion of the court.

It was conceded in the court below that the premises, to remove the cloud from which the present bill is filed, were at the time "pueblo lands" of San Francisco; that is, that they were part of the lands claimed by the city as successor of a Mexican pueblo of that name; that they are within the limits of the city of San Francisco as prescribed by the charter of 1851, and are within the four square leagues described in the decree of the United States Circuit Court for the District of California, entered May 18, 1865, by which the claim of the city as such successor was confirmed and its boundaries established, and also within the lines of the patent of the United States for the pueblo lands, issued to the city in 1884.

It was also stipulated that the decree of the Circuit Court and the patent of the United States should be considered as in evidence, and that all the statutes of California and of the United States affecting the pueblo lands of San Francisco might be referred to, in the consideration of the case, as though formally introduced in evidence.

The plaintiffs in their bill rely principally upon the decree of the District Court for the Twelfth Judicial District of the State, in the case brought by William J. Shaw to quiet his title against the claim of the defendant herein, contending that the title of Shaw, through whom they deraign their interest, was thereby adjudged to be valid as against the defendant and parties deriving title under the defendant, and that they are estopped from asserting against that decree any title or interest in the premises. The decree was rendered upon a disclaimer of the city and county of San Francisco, by its attorney, that it had any right, title or interest in the premises described in the complaint, or any part thereof, at the commencement of the suit, and its consent that the plaintiff might take judgment therein in accordance with his prayer. Whatever authority the attorney of the city and county may have had to conduct its ordinary litigation, he had none to relinquish rights reserved for the benefit of the public by the Van Ness ordinance; and the property in that case was claimed, as will be afterwards seen, under that ordinance alone.[1] The city

---

[1] In the opinion of the court reference is made to an ordinance of the city and county of San Francisco, entitled "An Ordinance for the settlement and quieting of land titles in the city of San Francisco," approved June 20, 1855, which is generally known as the Van Ness Ordinance, from the name of its reputed author. Mr. Justice Field has been so kind as to furnish the reporter with a copy of the second, third and fourth sections of that ordinance, and other documents connected with the subject, which are as follows:

### Van Ness Ordinance.

"Sec. 2. The city of San Francisco hereby relinquishes and grants all the right and claim of the city to the lands within the corporate limits, to the parties in the actual possession thereof, by themselves or tenants, on or before the first day of January, A.D., 1855, and to their heirs and assigns forever; excepting the property known as the slip property, and bounded on the north by Clay Street, on the west by Davis Street, on the south by Sacramento Street, and on the east by the water-lot front. And excepting, also, any piece or parcel of land situated south, east, or north of the water-lot front of the city of San Francisco, as established by an act of the Legislature of March 26, 1851; Provided, such possession has been continued up to the time of the introduction of this ordinance in the common council; or, if interrupted by an intruder, or trespasser, has been, or may be, recovered by legal process; and it is hereby declared to be the true

and county of San Francisco had previously succeeded to all the
rights of property, and become subject to all the liabilities, of

intent and meaning of this ordinance, that when any of the said lands have
been occupied and possessed under and by virtue of a lease or demise, they
shall be deemed to have been in the possession of the landlord or lessor under
whom they were so occupied or possessed; *Provided,* that all persons who
hold title to lands within said limits by virtue of any grant made by any
ayuntamiento, town council, alcalde or justice of the peace of the former
pueblo of San Francisco, before the 7th day of July, 1846; or grants to lots
of land lying east of Larkin Street and northeast of Johnston Street, made
by any ayuntamiento, town council or alcalde, of said pueblo, since that
date, and before the incorporation of the city of San Francisco by the State
of California; and which grant, or the material portion thereof, was regis-
tered, or recorded in a proper book of record deposited in the office, or
custody or control of the recorder of the county of San Francisco, on or
before the 3d day of April, A.D., 1850; or by virtue of any conveyance duly
made by the commissioners of the funded debt of the city of San Francisco,
and recorded on or before the first day of January, 1855, shall, for all the
purposes contemplated by this ordinance, be deemed to be the possessors
of the land so granted, although the said lands may be in the actual occu-
pancy of persons holding the same adverse to the said grantees.

"SEC. 3. The patent issued, or any grant made by the United States to the
city, shall inure to the several use, benefit, and behoof of the said posses-
sors, their heirs and assigns, mentioned in the preceding section, as fully
and effectually, to all intents and purposes, as if it were issued or made
directly to them individually and by name.

"SEC. 4. The city, however, as a consideration annexed to the next two
preceding sections, reserves to itself all the lots which it now occupies, or
has already set apart for public squares, streets, and sites for school-houses,
city-hall, and other buildings belonging to the corporation; and also such
lots and lands as may be selected and reserved for streets and other public
purposes, under the provisions of the next succeeding sections."

This ordinance was ratified by the legislature of California on March 11,
1858, (Stat. of California of 1858, chap. 66, p. 52).

And on July 1, 1864, Congress passed an act, entitled "An act to expe-
dite the settlement of titles to land in the State of California," by the fifth
section of which all the right and title of the United States to the lands
within the corporate limits of the city of San Francisco, as defined in its
charter passed April 15, 1851, was relinquished and granted to the city and
its successor for the uses and purposes specified in the ordinance, with
some exceptions not necessary to be here mentioned. (13 Stat. chap. 194,
sec. 5, p. 333.)

The following is the decree of the Circuit Court of the United States for
the District of California, entered May 18, 1865, confirming the claim of the
city of San Francisco to its pueblo lands:

the city. Act of April 19, 1856, consolidating the government of the city and county of San Francisco. Sess. Laws 1856, c. 125, p. 145.

---

THE CITY OF SAN FRANCISCO  
*vs.*  
THE UNITED STATES.

The appeal in this case, taken by the petitioner, the city of San Francisco, from the decree of the Board of Land Commissioners, to ascertain and settle private land claims in the State of California, entered on the twenty-first day of December, 1854, by which the claim of the petitioner was adjudged to be valid, and confirmed to lands within certain described limits, coming on to be heard upon the transcript of proceedings and decision of said board, and the papers and evidence upon which said decision was founded, and further evidence taken in the District Court of the United States for the Northern District of California pending said appeal — the said case having been transferred to this court by order of the said District Court, under the provisions of section four of the act entitled "An Act to expedite the settlement of titles to lands in the State of California," approved July 1st, 1864, — and counsel of the United States and for the petitioner having been heard, and due deliberation had, it is ordered, adjudged and decreed that the claim of the petitioner, the city of San Francisco, to the land hereinafter described is valid, and that the same be confirmed.

The land of which confirmation is made is a tract situated within the county of San Francisco, and embracing so much of the extreme upper portion of the peninsula *above ordinary high-water mark* (as the same existed at the date of the conquest of the country, namely, the seventh day of July, A.D. 1846,) on which the city of San Francisco is situated as will contain an area of four square leagues; said tract being bounded on the north and east by the Bay of San Francisco; on the west by the Pacific Ocean; and on the south by a due east and west line drawn so as to include the area aforesaid, subject to the following deductions, namely: such lands as have been heretofore reserved or dedicated to public uses by the United States, and also such parcels of land as have been, by grants from lawful authority, vested in private ownership and have been finally confirmed to parties claiming under said grants by the tribunals of the United States, or shall hereafter be finally confirmed to parties claiming thereunder by said tribunals in proceedings now pending therein for that purpose; all of which said excepted parcels of land are included within the area of four square leagues above mentioned, but are excluded from the confirmation to the city. This confirmation is in trust for the benefit of the lot-holders under grants from the pueblo, town or city of San Francisco, or other competent authority, and as to any residue, in trust for the use and benefit of the inhabitants of the city.                                                                                FIELD,  
                                                                                      *Circuit Judge.*

SAN FRANCISCO, *May 18th*, 1865.

Opinion of the Court.

The plaintiffs did not, however, on the hearing, rely principally, or to any great extent, upon any estoppel by that decree, but endeavored to establish their claim of title by conveyances from former occupants of different parcels of land, known as the "Kissling tract," and the "Thorne and Center tract," and of the rights enuring to the occupants under what is known, from its reputed author, as the Van Ness ordinance, the object of which was to settle and quiet the title of persons in possession of lands in the city of San Francisco; and under the act of the legislature of the State of California, passed in March, 1858, ratifying and confirming the ordinance; and under the act of Congress relinquishing and granting to the city all the interest of the United States to lands within the

---

The following is the act of Congress of March 8, 1866, also confirming said claim, and relinquishing all interest in the lands covered by that decree of confirmation not relinquished by the act of 1864.

" An act to quiet the title to certain lands within the corporate limits of the city of San Francisco," approved March 8, 1866.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all the right and title of the United States to the land situated within the corporate limits of the city of San Francisco, in the State of California, confirmed to the city of San Francisco by the decree of the Circuit Court of the United States for the Northern District of California, entered on the eighteenth day of May, one thousand eight hundred and sixty-five, be, and the same are hereby, relinquished and granted to said city of San Francisco and its successors, and the claim of said city to said land is hereby confirmed, subject, however, to the reservations and exceptions designated in said decree, and upon the following trusts, namely : that all the said land, not heretofore granted to said city, shall be disposed of and conveyed by said city to parties in the *bona fide* actual possession thereof, by themselves or tenants, on the passage of this act, in such quantities and upon such terms and conditions as the legislature of the State of California may prescribe, except such parcels thereof as may be reserved and set apart by ordinance of said city for public uses : *Provided, however,* That the relinquishment and grant by this act shall not interfere with or prejudice any valid adverse right or claim, if such exist, to said land or any part thereof, whether derived from Spain, Mexico, or the United States, or preclude a judicial examination and adjustment thereof." 14 Stat. 4.

The patent issued by the United States to the city of San Francisco upon the survey of her claim is dated June 20, 1884, and described the lands as bounded on the bay by ordinary high-water mark, as it existed July 7, 1846, the line of which crosses the mouth of all creeks entering the bay.

corporate limits of the act of 1851 in trust for the uses and purposes of that ordinance. They also claimed the benefit of a deed of the tide-land commissioners of the State to Eugene L. Sullivan, one of the grantors of William J. Shaw, dated December 3, 1870, which purported, for the consideration of $352.80, to release to the grantee the right, title and interest of the State of California to the premises therein described.

The testimony, documentary and otherwise, produced in the case, gives a very clear as well as accurate account of the origin, nature and extent of the title claimed by the city of San Francisco, or the city and county of San Francisco, to its municipal lands, as successors to the rights of the former pueblo. This history has been related in several cases in this court, notably in *Trenouth* v. *San Francisco*, 100 U. S. 251; *Palmer* v. *Low*, 98 U. S. 1; *Grisar* v. *McDowell*, 6 Wall. 363; and *Townsend* v. *Greeley*, 5 Wall. 326. A brief statement of the principal facts only will be necessary to an intelligent disposition of the questions presented for consideration.

When California was occupied by the forces of the United States in 1846 there was a Mexican pueblo at San Francisco, that is, a settlement or town under the Mexican government, with alcaldes and other officers, for the administration of its municipal affairs. It was the law of Mexico that pueblos or towns, when once recognized by public authority, became entitled, for their benefit and that of their inhabitants, to the use of lands constituting the site of such pueblos or towns, and adjoining territory, to the extent of four square leagues, to be measured off and assigned to them by officers of the government. *Townsend* v. *Greeley*, 5 Wall. 326, 336. Under those laws the pueblo of San Francisco asserted a claim to four square leagues, to be measured off from the northern portion of the peninsula on which the present city is situated. The alcaldes, or officers of the town, under the Mexican government, exercised the power of distributing the lands in small parcels to the inhabitants, for building, cultivation and other uses, the remainder being generally held for commons and other public purposes. When our forces took possession of San Francisco citizens of the United States were appointed by

the naval and military commanders to act in the place of the Mexican officers of the pueblo, and they exercised a like authority, which they supposed was invested in them, in making various grants of land in the city. Many persons then there, and many who subsequently settled in California, disputed such authority, and took up and occupied any land which they found vacant within the limits of the pueblo. The natural consequence followed — confusion and uncertainty in the titles in the city for some years after the acquisition of the country.

In April, 1850, San Francisco was incorporated by the state government as a city. She at once claimed the lands of the pueblo as its successor, and, after the Board of Land Commissioners to settle private land claims in California was created by act of Congress in March, 1851, prosecuted her claim to this land for confirmation. 9 Stat. c. 41, p. 631. In December, 1854, that board confirmed her claim to a portion of the four square leagues and denied it for the balance. The city appealed to the District Court of the United States from that decision, and the appeal remained there for some years undisposed of. In September, 1864, the case was transferred from that court to the Circuit Court of the United States, under the authority of the act of Congress to expedite the settling of titles to lands in the State of California, 13 Stat. 333, c. 194, § 4; and in October following its claim was confirmed to four square leagues, subject to certain reservations. The decree of final confirmation, in its present form, was not entered until the 18th of May, 1865. That decree confirmed the claim of the city to a tract of land embracing so much of the upper portion of the peninsula which is situated above the ordinary high-water mark of 1846, as would contain an area of four square leagues, the tract being bounded on the north and east by the bay of San Francisco, on the west by the Pacific Ocean, and on the south by a due east and west line drawn so as to include the area designated, subject to certain deductions which it is unnecessary to mention here. The confirmation was to San Francisco in trust for the benefit of lot-holders under grants from the pueblo, town or city of San Francisco, or

other competent authority, and as to any residue in trust for the benefit of the inhabitants of the city.

In April, 1851, the charter of San Francisco was repealed and a new charter adopted. Pending the appeal of the pueblo claim in the United States District Court, the Van Ness ordinance, above mentioned, was passed by the common council of the city, by which the city relinquished and granted all its right and claim to land within its corporate limits as defined by its charter of 1851, with certain exceptions, to parties in the actual possession thereof by themselves or tenants on or before the first of January, 1855; provided such possession was continued up to the time of the introduction of the ordinance into the common council, which was in June, 1855, or, if interrupted by an intruder or trespasser, had been or might be recovered by legal process; and it declared that for the purposes contemplated by the ordinance persons should be deemed possessors who held titles to land within those limits by virtue of a grant made by any ayuntamiento, town council, alcalde or justice of the peace of the former pueblo before the 7th of July, 1846, or by virtue of a grant subsequently made by the authorities, within certain limits of the city previous to its incorporation by the State, provided the grant, or a material portion of it, had been recorded in a proper book of records in the control of the recorder of the county previous to April 3, 1851. The city among other things, reserved from the grant all the lots which it then occupied or had set apart for public squares, streets, and sites for school houses, city hall, and other buildings belonging to the corporation, but what lots or parcels were thus occupied or set apart does not appear.

Subsequently, in March, 1858, the legislature of the State ratified and confirmed this ordinance, (Stats. of Cal. of 1858, c. 66, p. 52,) and by the fifth section of the act of Congress to expedite the settlement of titles to lands in the State of California, the right and title of the United States to the lands claimed within the corporate limits of the charter of 1851 were relinquished and granted to the city and its successors for the uses and purposes specified in that ordinance. 13 Stat. 333, c. 194, § 5.

Notwithstanding the title to the lands within the limits of the charter of 1851 was thus settled, the appeal from the decree of the Board of Land Commissioners was prosecuted both by the city and the United States — by the city from so much of the decree as included in the estimate of the quantity of the land confirmed, the reservations made — and by the United States from the whole decree.

Whilst these appeals were pending, Congress passed the act of March 8, 1866, to quiet the title to the land within the city limits. 14 Stat. c. 13, p. 4. At that time the limits of the city were coincident with those of the county, and embraced the whole of the four square leagues confirmed. By that act all the right and title of the United States to the land covered by the decree of the Circuit Court were relinquished and granted to the city, and the claim to the land was confirmed, subject, however, to certain reservations and exceptions, and in trust that all land not previously granted to the city should be disposed of and conveyed by the city to the parties in the *bona fide* actual possession thereof, by themselves or tenants, on the passage of the act, in such quantities and on such terms and conditions as the legislature of the State of California might prescribe, excepting such parcels as might be reserved and set apart by ordinance of the city for public uses. In consequence of this act the appeals pending were dismissed. *Townsend* v. *Greeley*, 5 Wall. 326. The title of the city, therefore, rests upon the decree of the court recognizing its title to the four square leagues, and establishing the boundaries, and the confirmatory acts of Congress. *Grisar* v. *Mc-Dowell*, 6 Wall. 363.

The trust upon which the city held the municipal lands it had acquired as successor of the Mexican pueblo, as declared in the decree of confirmation, was a public and municipal trust, to be exercised chiefly in the distribution of the lands to occupants and settlers and in the use of the remainder for the public purposes of the city; and the exercise was subject to the supervision and control of the legislative authority either of the State or of the United States, and it does not matter which, inasmuch as its exercise, as directed by the Van Ness

ordinance, was authorized both by the legislature of the State and the act of the Congress of the United States. The purpose of the ordinance, as indicated in its title, as well as in its several provisions, was to settle and quiet titles to lands in the city of San Francisco. The settlement which it made was by a recognition of certain previous grants of the city or of its officers and the transfer of its title to those who had occupied the lands in good faith during certain periods. As held by the Supreme Court of California, in its elaborate and exhaustive examination of the law respecting the property rights of Mexican pueblos, in *Hart* v. *Burnett*, 15 California, 530, 612, the ordinance was justified by a policy which was analogous to the laws and purposes which gave existence to the rights of the pueblo. Section two of an order of the common council, passed on the 16th of October, 1856, which was ratified by the same legislative act of the State which confirmed the Van Ness ordinance, provides that the grant or relinquishment of title made by that ordinance in favor of the several possessors of the land should take effect as fully and completely for the purpose of transferring the city's interest, and for all other purposes whatsoever, as if deeds of release and quit-claim had been duly executed and delivered to the parties individually and by name, and that no further conveyance or act should be necessary to invest such possessors with the interest, title, rights and benefits which. the ordinance intended or purported to transfer and convey.

The claims of the grantors of the plaintiffs to the title to the lands, through conveyances from Kissling, and from Thorne and Center, are fully sustained by the evidence. Kissling settled upon a parcel of the land in relation to which this suit is brought, in March, 1849. He was at the time a native of Denmark, but had declared his intention to become an American citizen, and in the notice which he recorded of his claim he represented it as a preëmption right to one hundred and sixty acres of land in the district of San Francisco. That claim of itself was of no value whatever, as the lands were not subject to preëmption, not being lands of the United States, nor would they have been even if owned by the United States,

except under the town-site act, because they were within the limits of what was then a town; but a large portion of the tract thus taken up was fenced in by Kissling, occupied by him, and a portion of it cultivated. His occupation was continuous during the whole period required by the ordinance to enable him to have the benefit of the transfer it made. He, therefore, acquired as complete a title in the interest which the city then held in the property as it was possible for the city to convey, under the Van Ness ordinance and the confirmatory legislation of the State and the United States.

The same may be said of the claim taken up by Thorne and Center on the 5th of August, 1850, and which purported to cover sixty acres. Of itself, it was, like the other, of no validity, and conferred no rights, for the land was not public land open to acquisition in that way. But these parties enclosed the land, occupied and cultivated it, and exercised acts of ownership over it, until the 15th of July, 1854, when they sold four and one-half acres of it to one Charles V. Stewart. They continued, however, to exercise ownership over the residue during all the period required by the Van Ness ordinance to obtain its benefits and the transfer of title from the city. As to the four and one-half acres sold, the grantee continued in the possession and use of that portion also, during the period required by the ordinance.

The title to the lands thus claimed by Kissling, and by Thorne and Center, and by Stewart as a purchaser from them of four and a half acres, became, by operation of that ordinance and the confirmatory legislation mentioned vested in those parties, and by their conveyance passed to William J. Shaw, and was by him conveyed to Eugene L. Sullivan, and thence to the plaintiffs in this suit. All the right, title, and interest which the city held, and which could be conveyed under the Van Ness ordinance, had therefore passed to Shaw when the suit to quiet his title was commenced and carried to judgment in the District Court of the Twelfth Judicial District Court of the State, and whatever benefit Shaw had acquired by that decree in his favor enured to the benefit of his grantees, the public rights reserved by the Van Ness ordinance

being necessarily excepted. One of those was a reservation, notwithstanding its grant, of lands then occupied or set apart for public squares, streets and sites for school houses, city hall, and other buildings belonging to the corporation; and the decree in this case should have excepted from its operation the lands thus reserved. An effort was made before the examiner, who took the evidence in the case, to do away with the reservation by the verbal statement of a witness that the premises described did not include "any school-lots, engine-lots, hospital-lots or property dedicated for street purposes or public squares;" but such testimony was objected to as incompetent, and as not being the best evidence the subject admitted of, and the objection was in our judgment well taken. If there were no reservations, as specified in the ordinance, the fact should have been established by the public records of the city and county. Its property reserved by statute from private ownership for public uses is not to be sacrificed or lost upon loose verbal testimony of the character offered.

We do not attach any importance, upon this question of reservation, to the deed of the tide-land commissioners, executed to Sullivan on the 3d of December, 1870, for the State did not at that time own any tide or marsh lands within the limits of the pueblo as finally established by the Land Department. All the marsh lands, so called, which the State of California ever owned, were granted to her by the act of Congress of September 28, 1850, known as the Swamp-land Act, by which the swamp and overflowed lands within the limits of certain States, thereby rendered unfit for cultivation, were granted to the States to enable them to construct the necessary levees and drains to reclaim them. 9 Stat. c. 84, p. 519. The interest of the pueblo in the lands within its limits goes back to the acquisition of the country, and precedes the the passage of that act of Congress. And that act was never intended to apply to lands held by the United States charged with any equitable claims of others, which they were bound by treaty to protect. As to tide-lands, although it may be stated as a general principle — and it was so held in *Weber* v. *Board of Harbor Commissioners*, 18 Wall. 57, 65, — that the

titles acquired by the United States to lands in California under tide-waters, from Mexico, were held in trust for the future State, so that their ownership and right of disposition passed to it upon its admission into the Union, that doctrine cannot apply to such lands as had been previously granted to other parties by the former government, or subjected to trusts which would require their disposition in some other way. When the United States acquired California it was with the duty to protect all the rights and interests which were held by the pueblo of San Francisco under Mexico. The property rights of pueblos equally with those of individuals were entitled to protection, and provision was made by Congress in its legislation for their investigation and confirmation. *Townsend* v. *Greeley*, 5 Wall. 326, 337. The duty of the government and its power in the execution of its treaty obligations to protect the claims of all persons, natural and artificial, and of course of the city of San Francisco as successor to the pueblo, were superior to any subsequently acquired rights or claims of the State of California, or of individuals. The confirmation of the claim of the city necessarily took effect upon its title as it existed upon the acquisition of the country. In confirming it the United States through its tribunals recognized the validity of that title at the date of the treaty — at least, recognized the validity of the claim to the title as then existing, and in the execution of its treaty obligations no one could step in between the government of the United States and the city seeking their enforcement. It is a matter of doubt whether there were any lands within the limits of the pueblo, as defined and established by the Land Department, that could be considered tide-lands, which, independently of the pueblo, would vest in the State. The lands which passed to the State upon her admission to the Union were not those which were affected occasionally by the tide, but only those over which tide-water flowed so continuously as to prevent their use and occupation. To render lands tide-lands, which the State by virtue of her sovereignty could claim, there must have been such continuity of the flow of tide-water over them, or such regularity of the flow within every twenty-four hours,

as to render them unfit for cultivation, the growth of grasses, or other uses to which up-land is applied. But even if there were such lands, their existence could in no way affect the rights of the pueblo. Its rights were dependent upon Mexican laws, and when Mexico established those laws she was the owner of tide-lands as well as up-lands, and could have placed the boundaries of her pueblos wherever she thought proper. It was for the United States to ascertain those boundaries when fixing the limits of the claim of the city, and that was done after the most thorough and exhaustive examination ever given to the consideration of the boundaries of a claim of a pueblo under the Mexican government. After hearing all the testimony which could be adduced, and repeated arguments of counsel, elaborate reports were made on the subject by three Secretaries of the Interior. They held, and the patent follows their decision, that the boundary of the bay, which the decree of confirmation had fixed as that of ordinary high-water mark, as it existed on the 7th of July, 1846, crosses the mouth of all creeks entering the bay. There was, therefore, nothing in the deed of the tide-land commissioners which could by any possibility impair the right of the city to exercise the power reserved in the Van Ness ordinance over such portions of the lands conveyed to occupants under that ordinance as had been occupied or set apart for streets, squares and public buildings of the city. Such a reservation should have been embodied in the decree in this case.

*The decree should therefore be modified by adding the declaration that nothing therein shall be deemed to impair in any respect the rights reserved in the Van Ness ordinance to the city of San Francisco, or to its successor, the city and county of San Francisco, over lands that had then been occupied or set apart for streets, squares and public buildings of the city, and as thus modified be affirmed; and it is so ordered.*