HOUSTON *v.* CITY AND COUNTY OF SAN FRANCISCO *et al.*

*(Circuit Court, D. California.* August 15, 1891.)

**1. SUIT TO RECOVER LAND—DISHONEST PURPOSE—DISMISSAL OF BILL—ATTORNEYS.**

Attorneys admitted to practice in the United States courts in California, and who bring suits founded upon grants of land by the former Mexican government, are presumed to know the provisions of Act Cong. March 3, 1851, declaring, among other things, that all lands, the claims to which shall not have been presented to the board of land commissioners for the settlement of private claims in California, "within two years after the date of this act, shall be deemed, held, and considered as part of the public domain of the United States:" and also to be cognizant of the decisions of the supreme court of the United States in *More* v. *Steinbach*, 127 U. S. 81, 8 Sup. Ct. Rep. 1067, and *Botiller* v. *Dominguez*, 130 U. S. 255, 9 Sup. Ct. Rep. 525, holding that no Mexican title not thus presented could be of any validity; and where one brings a suit against numerous land-owners in San Francisco on a Mexican title which was not presented to the board, but makes no attempt for nearly two years to have the subpoenas served, in the mean time obtaining money by way of compromise from numerous owners ignorant of the law, it will be presumed that the suit was instituted with a dishonest purpose, and the bill will be dismissed.

**2. DISMISSAL OF BILL—NOTICE TO ATTORNEY.**

When the attorney of record in a suit affecting land lives in another state, the court has the authority to dismiss the action after service of notice on him at his residence.

**3. SOURCES OF LAND TITLE IN SAN FRANCISCO.**

There are but five valid sources of title to lands in the city of San Francisco: (1) Original Mexican grants to individuals or associations, which were presented to the board of land commissioners for the settlement of private claims, under Act Cong. March 3, 1851, and confirmed either by the board itself, or, after rejection, by the district or supreme court of the United States, and subsequently surveyed and patented by the government. These patents cannot be collaterally assailed by private parties either as to the validity of the grants confirmed or their extent and boundaries. If erroneous, the government alone can vacate or correct them in a direct proceeding for that purpose. (2) The pueblo claim, which was confirmed to the city of San Francisco by the decisions of the United States courts, and confirmatory acts of congress, and which was surveyed and patented to the city by the United States. Neither the title nor boundaries of this claim can now be questioned collaterally. (3) Reservations made by the president of the United States, under the law, for public purposes. These are all clearly defined and marked, and can easily be ascertained from the city maps. (4) Tide-lands lying outside the line of ordinary high water as it existed July 7, 1846, the title whereof belonged to the state, which, by Act Cal. March 26, 1851, granted the use of certain tracts to the city for 99 years. This high-water line has been surveyed and established by the United States, and is shown on the patent issued. Its correctness cannot be attacked by private parties. (5) Lands lying on the south side of the pueblo, which, by Act Cong. Dec. 20, 1886, were ceded to the city and county of San Francisco, and to those persons and their successors in interest to whom the city and county had previously conveyed, under the erroneous impression that these lands were within the pueblo claim.

In Equity.

Suit by David D. Houston against the city and county of San Francisco and numerous land-owners, to recover lands under a Mexican grant. On motion to dismiss the amended bill.

*John H. Durst,* Attorney for the City and County of San Francisco, for the motion.

*Philip Teare, Esq.,* appeared for the solicitor of the complainant, and applied for a postponement of the hearing of the motion, which application was denied. It was then shown that the notice of motion was personally served upon the complainant's counsel at his residence at Seattle, in the state of Washington, and also upon the clerk of the court. The motion was then heard.

FIELD, Justice. This is a motion to dismiss the amended bill of complaint upon the ground that no effort has ever been made by the complainant, or his solicitor, to procure service upon the defendants, or any of them, of the *alias* subpœna issued in the cause. The motion is made upon the papers filed, and the affidavits of the mayor of the city and county of San Francisco, and of the deputy-marshal of the United States; the city and county appearing specially for that purpose and no other. The affidavit of the mayor states that the original bill of complaint was filed on the 20th of June, 1889; that the city and county and about 100 persons were named as defendants; that no subpœna was ever issued thereon, as the affiant is informed and believes; and that no application was ever made to the clerk of the court by the complainant or his solicitor, or by any other person, for the issue of such subpœna; that on the 19th of June, 1890, the complainant filed an amended bill of complaint, in which all of the defendants in the original bill, and about 15,000 other persons, were named as defendants; that thereupon a subpœna was issued, directed to them, commanding them to appear and answer the amended bill; that, as the affiant is informed and believes, the subpœna was never placed by any one in the hands of the United States marshal for the district, or of any other officer, for service, and that there was no effort of any kind, by any person, to procure service upon any of the defendants, and that no such service was ever made; that on the 4th of August, 1890, the subpœna was returned and filed without service, and on the same day an *alias* subpœna was issued, directed to the defendants, but was never placed in the hands of the marshal, or any other person, for service, and that no effort was made to secure such service; that at all times service could have been made on the city and county of San Francisco, and, as the affiant is informed and believes, upon the other defendants; that none of the defendants have appeared in the suit, and that all the defendants, other than the city and county of San Francisco, claim through that municipality. None of the allegations of this affidavit, made upon information and belief, are controverted, as they might have been if not correct. They must, therefore, be taken on this motion as true. The affidavit of the deputy-marshal states that from June 20, 1889, he has had general charge and control of all subpœnas left with or placed in the hands of the United States marshal for the district for service, and that neither the original subpœna, nor the *alias* subpœna issued in the cause, was ever left or deposited with, or placed in the hands of the marshal by the complainant or his solicitor, or by any other person, for service upon the defendants; and that the marshal has never been requested or directed by any one to procure such service upon any of the defendants.

These affidavits show conclusively the failure of the complainant to make any effort to obtain service of the subpœna, or of the *alias* subpœna, upon any of the defendants from the filing of the original bill of complaint, June 20, 1889, to the present time, though such service was readily obtainable. For such failure to prosecute the suit the amended bill, and, indeed, the whole case, may be properly dismissed. For it

no reasonable or just excuse has been or can be offered. It was not accidental, but was intended, and, it is apparent, was in the execution of a dishonest and corrupt purpose on the part of the complainant and his solicitor. The bill of complaint is ostensibly for the purpose of charging the defendants, about 15,000 persons besides the city and county of San Francisco, as trustees for the complainant of a tract of land, including a large part of the city and county, of the value of many millions of dollars and compelling them to convey it to him. In the minds of the greater number of persons in possession of the property claimed, not familiar with the laws affecting titles in this city and county, the filing of the complaint and the pendency of the suit were calculated to create doubt and uneasiness as to the validity of their own titles, and naturally to induce them to seek a release of the claim asserted. For such a release a pecuniary compensation was exacted, and it is notorious that its payment was obtained in a multitude of instances.

Yet, in looking over the complaint, we see no cause of action, legal or equitable, disclosed, for the release of which any compensation could be honestly required. The cause of action is the alleged grant of the premises by officers of the former Mexican government to one Fernando Machine, and mesne conveyances under him. The alleged grant, if one ever existed, was not presented for examination and confirmation to the board of land commissioners for the settlement of private land claims in California, under the act of congress of March 3, 1851. The land embraced within the alleged grant thus became, by the expressed declaration of congress in that act, which was passed to carry out our treaty obligations with Mexico, and by the decisions of the supreme court of the United States thereon, public land, no longer subject to any private ownership by virtue of the grant. Section 13 of that act declares that all lands, the claims to which have been finally rejected by the commissioners, as therein provided, "or which shall be finally decided to be invalid by the district or supreme court, and all lands, the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held, and considered as part of the public domain of the United States." 9 St. U. S. 633. In *More* v. *Steinbach*, 127 U. S. 81, 8 Sup. Ct. Rep. 1067, it was held by the supreme court of the United States that "the ascertainment of existing claims was a matter of vital importance to the government in the execution of its policy respecting the public lands, and congress might well declare that a failure to present a claim should be deemed an abandonment of it, and that the lands covered by it should be considered a part of the public domain." And in *Botiller* v. *Dominguez*, 130 U. S. 255, 9 Sup. Ct. Rep. 525, that court said:

"We are quite satisfied that upon principle, as we have attempted to show, there can be no doubt of the proposition that no title to land in California dependent upon Spanish or Mexican grants can be of any validity which has not been submitted to and confirmed by the board provided for that purpose in the act of 1851, or, if rejected by that board, confirmed by the district or supreme court of the United States."

The alleged grant upon which the bill is filed does not purport to be a grant under the pueblo or its successors, and therefore its holder could in no respect claim any benefit under the confirmation of the pueblo title. It was a grant hostile to the claim of the city. Every one admitted to the bar of any of the courts of the United States, instituting suits founded upon grants of the former Mexican government, is presumed to know the law of congress respecting such grants, and the decisions of the supreme court of the United States thereon. No lawyer of those courts can justify his action with respect to such lands upon any pretense of ignorance of that law and of those decisions. Where it is manifest, as in the case before us, that he desires to postpone the determination of the character of the grant presented by preventing the appearance of the parties to the suit brought, an unworthy and dishonest motive may be justly imputed to him. Intended, as such suits generally are, as a means of extorting moneys from the rightful possessors of the property claimed, they become little less than instruments of robbery. When such purpose is seen, the suit should be dismissed, and the lawyers who have lent themselves to its prosecution should be removed from the bar. They are unworthy to be members of a noble profession, and are only a reproach to it. In this case the dishonest purpose of the complainant and of his solicitor is manifest from the intentional failure to bring the alleged controversy to a hearing and determination. No effort since the filing of the complaint has been made by them to get the parties before the court. The complainant's solicitor cannot plead ignorance of the act of congress, and of what the supreme court has said thereon, and must have known that the case would be thrown out of court the moment its merits were examined. Both he and the complainant wanted to keep it in court undetermined that it might, by the doubts it would create in the minds of many of the occupants of the land as to their title, lead to a successful exaction of money for its release.

The affidavit of John K. Moore, that he has been ever since the commencement of this action, and now is, the attorney in fact for the complainant, and empowered to act in all matters pertaining to the action; that George W. Tyler, the solicitor for the complainant, has been absent from the state more than two months, and is a resident of Seattle, in the state of Washington; and that he (Moore) has been endeavoring to secure the services of another solicitor to act in his behalf, but has been unable to do so, so as to advise him of the merits and facts of the suit, and enable him to properly resist this application for dismissal,—merits no consideration. There was no information which he could give to excuse the delay in the prosecution of this suit, and, if there had been, it could all have been communicated to any lawyer in an hour.

Notice of this motion was served upon Tyler personally at Seattle, and notice for him was also left with the clerk of the court. Where an attorney or solicitor in a suit affecting land leaves the state, and no one is appointed in his place, the authority of the court to dismiss such suit, where there is a failure to prosecute it, is not defeated. It can be

exercised upon notice served upon the attorney or solicitor at his place of residence in another state, or by filing the same under the rules of the court with the clerk of the court.    Besides, the counsel who asked for a postponement of the hearing of the motion appeared as the representative of Tyler, the solicitor of record for the complainant, and such appearance is sufficient for the hearing of the motion.

In disposing of the motion in this case, I remarked that I would write out my opinion, and indicate the original sources of title to real property in this city, to the end that suits like the present one may be readily detected and defeated.    There is no other city in the world where the sources of title to real property are so clearly defined, nor any city where more numerous attempts are constantly made to defeat or impair them.    There are only five original sources of title to such property:

*First.*  The original Mexican grants to individuals or associations, which were presented for confirmation under the act of congress of March 3, 1851, and which were confirmed and subsequently surveyed and patented by the United States.    The patents in these cases cannot be collaterally assailed by private parties, either as to the validity of the grants confirmed or as to their extent and boundaries.    If erroneous in any particular, they can only be vacated or corrected by the action of the government in direct proceedings for that purpose.

*Second.*  The pueblo claim.    Whatever differences of opinion prevailed originally as to the title of the pueblo to land upon which the city and county of San Francisco are situated, all doubt upon that subject has been put to rest by the confirmation of its claim and its survey and patent under the direction of the tribunals of the United States and of the land department.    As said by the supreme court of the United States in a decision made as late as March 2d of the present year, (1891:)

"The confirmation of the claim of the city necessarily took effect upon its title as it existed upon the acquisition of the country.    In confirming it the United States, through its tribunals, recognized the validity of that title at the date of the treaty,—at least, recognized the validity of the claim to the title as then existing; and in the execution of its treaty obligations no one could step in between the government of the United States and the city seeking their enforcement.    *    *    *    Its rights were dependent upon Mexican laws, and when Mexico established those laws she was the owner of tide-lands as well as uplands, and could have placed the boundaries of her pueblos wherever she thought proper.    It was for the United States to ascertain those boundaries when fixing the limits of the claim of the city, and that was done after the most thorough and exhaustive examination ever given to the consideration of the boundaries of a claim of a pueblo under the Mexican government.    After hearing all the testimony which could be adduced, and repeated arguments of counsel, elaborate reports were made on the subject by three secretaries of the interior.    They held, and the patent follows their decision, that the boundary of the bay, which the decree of confirmation had fixed as that of ordinary high-water mark, as it existed on the 7th of July, 1846, crosses the mouth of all creeks entering the bay."    *San Francisco City and County* v. *LeRoy*, 138 U. S. 671, 672, 11 Sup. Ct. Rep. 364.

*Third.* Reservations made by the president of the United States, under the law, for public purposes, of lands within the limits of the pueblo. These are all clearly defined and marked, and can easily be ascertained upon the maps of the city.

*Fourth.* Tide-lands lying outside of the limits of ordinary high-water mark of the bay existing on the 7th of July, 1846. The title to the lands beyond that line belonged to the state, and by her legislature an act was passed on March 26, 1851, by which the use of certain lands beyond that line, described therein, was conveyed to the city for a period of 99 years. St. Cal. 1851, p. 307. That line was then designated to a certain extent by what was known as the "Red-Line Map," and since then it has been definitely established and surveyed by the land department of the United States, and is shown in the patent issued. The correctness of that line, as thus established and embodied in the patent, can never be assailed, except by direct proceedings instituted by the United States for that purpose. Its correctness cannot be attacked collaterally. Any efforts in that direction must necessarily prove futile, unless the land policy of the United States is changed, and a reversal is had of numerous decisions of their highest tribunal.

*Fifth.* After the patent of the United States to the city of San Francisco and its successors was issued, there was a cession made by congress on December 20, 1886, to the city and county of San Francisco, of lands on the south side of the pueblo, and to those persons and their successors in interest to whom portions of the land had been previously conveyed on behalf of the city and county. The principal object of the act was to give security to the parties who had acquired the title under the impression that the property belonged to the pueblo, but which, by the survey and patent, were excluded therefrom. 24 U. S. St. at Large, 351.

I have made these observations respecting the sources of title to real property in San Francisco because I have a profound conviction that the future prosperity of the city will greatly depend upon the security and stability of its land titles; and I have thought that they might possibly do something to prevent that unscrupulous and vile system of annoyance which is now pursued in a great number of cases, for the purpose of extortion, by certain persons in this city, and I have made no statements beyond the settled adjudications of the supreme court of the United States, the only tribunal which can speak authoritatively and finally upon the subject. By the order and decree of the court entered on the 12th inst. the amended bill and the suit thereon were dismissed as to all the defendants, at the cost of the complainant.