## SENA *v.* UNITED STATES.

APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 40. Argued January 16, 1903.—Decided April 6, 1903.

1. Where the boundaries of a Spanish grant made in 1728, are defined with accuracy they will not be controlled by vague and practically unintelligible terms as to quantity.

2. While, owing to the loose manner in which they were made and the boundaries described, this court has been extremely liberal in construing Spanish grants, such grants must still be construed favorably to the government, and the grantee is bound to show not only the grant itself, but that its boundaries were fixed with reasonable certainty; and where the Court of Private Land Claims has held that the evidence of settlement, occupation, continuity of possession, cultivation, etc., is so vague, contradictory and uncertain as to be almost wanting, this court in the absence of clear evidence to the contrary will adopt the opinion of the court below in that particular.

3. Where the last known occupant of a Spanish grant made in 1728 had been killed by the Indians in 1839, and when the land passed to the United States under the treaty of 1848 with Mexico possession had been abandoned by his descendants for at least nine years and no action was taken by any one in regard to the grant until 1899, and meanwhile the public land surveys were extended over the tract in 1861, homestead and other entries were made, improvements established, patents secured and mines opened and developed, the doctrine of laches is peculiarly applicable, and under the provisions of the statute establishing it, the Court of Private Land Claims could not be called upon to confirm such a grant.

THIS was a petition for the confirmation of a tract of land in the county of Santa Fé, New Mexico, known as the José de Leyba grant, which has never been officially surveyed, but is estimated to contain about 18,000 acres.

After filing the petition it was found there were a number of persons holding portions of the tract sued for under a claim of title adverse to the grant; and upon motion of the United States requiring these adverse claimants to be made parties defendants, the original petition was amended, and two of these, the American Turquoise Company and one McNulty, joined with the United States in defending the case.

The court disallowed the claim upon the ground that the evidence did not show a perfect grant, inasmuch as there was no evidence of a compliance with the royal ordinance of 1754, which provided that all grants subsequent to 1700 must be confirmed as a prerequisite to their validity ; and that, if it were an imperfect grant, it should, under the act creating the Court of Private Land Claims, have been filed within two years from the taking effect of the act, and was therefore barred.

Since the decree of the Court of Private Land Claims certain additional evidence has been discovered, tending to show possession of the land covered by the grant for a long period subsequent thereto, and which it is now insisted supplies the defects which caused the rejection of the grant.

*Mr. Frank W. Clancy* for appellant. *Mr. H. S. Clancy* was on the brief.

*Mr. Special Assistant Matthew G. Reynolds* for the United States. *Mr. Solicitor General Richards, Mr. Special Assistant Attorney Pope* and *Mr. Ward L. Bartlett* were on the brief.

*Mr. James W. Vroom* was on a brief for defendant Prince.

MR. JUSTICE BROWN, after making the foregoing statement, delivered the opinion of the court.

The petition of Leyba, upon which the grant was originally made, and which is the material document in this case, and is in the Spanish language, is thus translated in the record :

"City of Santa Fé, May 24, 1728, before the governor and captain general of this kingdom; there was presented this petition with its contents:

"Joseph de Leyba, resident of the city of Santa Fé, appear before your excellency in due legal form, and state that in accordance with the royal ordinance of his Royal Majesty, I enter a piece of land and wood, vacant and unsettled, enough for half a *fanega* of corn-planting land, somewhat more or less, which is bounded on the east by the San Marcos road ; on the

south by an arroyo called Cuesta del Oregano; on the west by land of Juan Garcia de las Rivas, and on the north by lands of Captain Sebastian de Vargas.

" Therefore, I ask and pray, your excellency be pleased to make me in the name of His Majesty, a grant for the said piece of land, for myself and my children, heirs and successors, and that the act of royal possession be executed to me whereby I will receive benefit and favor as well as justice which I seek. And I swear in due form that this my petition is not made in malice and as it may be necessary, etc.

"JOSEPH DE LEYBA."

Annexed thereto is the grant of the governor and captain general of the province, with the condition that the grantees settle the land within the term prescribed by the royal ordinances, and a direction to the alcalde to put the party in possession.

Following this is the report of the chief alcalde of the city of Santa Fé, that having taken witnesses and "inspected the lands and woods prayed for by the said petitioner," he put him in royal possession by performing the customary ceremonies of livery of seizin.

There are two disputed propositions connected with this petition of Leyba's : (1) As to the quantity of land granted; (2) as to its boundaries. It is admitted by both parties that the above translation from the record of the quantity of the land granted "as a piece of land and wood, vacant and unsettled, enough for half a *fanega* of corn-planting land, somewhat more or less," is incorrect, the original Spanish being as follows: " *Registro un pedaso de tierras y monte, yermo y despoblado, que cabe media funega de maiz de sembradura, poco mas ó menos.*"

The argument of the government is that the quantity covered by the grant was only enough land to plant half a *funega* of corn, a little more or less, and that as a *fanega de maiz* is a measure of corn which will plant 8.82 acres, half of a *fanega* would measure, 4.41 acres; the government translation being " I register a piece of land, and woods, uncultivated and unsettled, that will contain half a *fanega de maiz de sembradura,* a

little more or less." The inference from this is that all that was conveyed was a piece of land that "will contain" enough for half a *fenega of maiz*. Claimant's translation, however, of the words "que cabe" is that it is a tract of land that "contains" within its outer boundaries half a *fanega* of corn, that is, of land capable of cultivation.

The probabilities, aside from the fact that the word "cabe" is a verb of the present tense, favor the construction of the claimant, as the words "lands and woods" would hardly be used as descriptive of a tract of four and one half acres. In addition to that, however, the description of quantity is wholly inconsistent with the boundaries, (hereafter stated,) which evidently contemplated a large tract of land, according to the Spanish and Mexican customs of making grants to settle. Indeed, a grant of four and one half acres of land at a distance from any town, city or settlement is so rare that the presumptions are all against it. If the boundaries were defined with accuracy, we should have very little difficulty in holding that they would not be controlled by the vague description of "a parcel of land and woods, uncultivated and unsettled, which includes half a *fanega* of corn-planting land."

This is the more apparent by an inspection of the subsequent documents, which include a will of Simon de Leyba, son of the grantee, of the year 1783, giving the boundaries of the tract, and a deed of Salvador Antonio de Leyba, grandson of José, to his son in 1834, also describing the lands by similar boundaries. Indeed, none of the subsequent documents make any reference whatever to the half *fanega* of corn-planting land. The will also contains a bequest of live stock and farming tools seemingly appurtenant to the ranch and greatly in excess of what would naturally belong to a tract of four and a half acres.

2. The difficulty, however, is with the description of the boundaries themselves, which is: "On the east by the San Marcos road; on the south by an arroyo called Cuesta del Oregano; on the west by land of Juan Garcia de las Rivas, and on the north by lands of Captain Sebastian de Vargas." In the will of Simon de Leyba of 1783 the boundaries are the same upon the south and east, and on the north "the road which goes

towards Pecos from the Cerillos, *or* lands of Captain Sebastian de Vargas," and on the west " with the lands of the old Pueblo of the Cienega." The land is described in substantially the same terms in the deed of 1834. The description of the lands on the east side as bounded by the San Marcos road is clearly defined. The description of the north boundary as the road from Pecos to the Cerrillos is also defined with somewhat less certainty, the lands of Sebastian de Vargas having been located, surveyed and confirmed several miles to the east of the Leyba grant; but upon the west and south the boundaries, even as sworn to orally by witnesses, are so uncertain as to afford little guide to a surveyor in attempting to locate the tract.

The west boundary, which is described in the grant as " the lands of Juan Garcia de las Rivas," is described in the will of 1783 as " the lands of the old Pueblo of the Cienega." While there is some evidence from the archives that the father of Garcia de las Rivas, in 1701, owned a piece of land somewhere west of the Leyba tract, known even then as the old Pueblo of la Cienega, there is nothing to show the east boundary of the Pueblo, and consequently the west boundary of the Leyba tract. The south boundary, said to be " an arroyo called Cuesta del Oregano," it seems to be impossible to locate with any degree of certainty, though it was probably near the Coyote Spring, at which the only house built upon this tract appears to have been located. This house long since fell into ruins, and there is no evidence that it has been occupied since the last owner of the grant, Juan Angel de Leyba, was supposed to have been killed by the Indians in 1839.

The evidence of possession subsequent to the grant does not afford much aid in fixing the boundaries, since the land, like most of that in Spanish-American territories, was not of a kind admitting of a well defined, actual and adverse possession, such as that of cultivated land. The most favorable view for petitioner that can be taken of this evidence is that possession of a house or a certain field of arable land may be referable to the entire tract included within the boundaries of the grant; but when the boundaries themselves are indefinite, the possession of a house is of no value in fixing the boundaries. A grant too

indefinite to be located and never fixed by any survey, is void as against the United States. As was observed in *United States* v. *Delespine*, of a Spanish grant in Florida, 15 Pet. 319, 335, "the public domain cannot be granted by the courts." They may locate the boundaries fixed by grant, but the boundaries must be so fixed as to admit of a survey. *United States* v. *Miranda*, 16 Pet. 153, 160; *United States* v. *Ring*, 3 How. 773; *Villalobos* v. *United States*, 10 How. 541; *Arivaca Land and Cattle Co.* v. *United States*, 184 U. S. 649, 652.

The grant was made and possession was given to the grantee in 1728. Nothing being shown to the contrary, we presume that the possession continued until 1783, the date of the will of Simon de Leyba, to his son Salvador Antonio de Leyba, "whom I recognize as my sole heir." The next item of interest tending to show possession is the deed of Salvador Antonio de Leyba in 1834 to his son Juan Angel de Leyba, who are both described as residents of the city of Santa Fé, wherein the same boundaries are also given, although the land is called "the rancho of the Coyote Spring, with its houses and corrals, together with the grant in which the said ranch is situated, which was given to my grandfather by the King of Spain May 25, 1728." Juan Angel appears to have been killed by Indians a few years after this deed was made, but it seems to have been uncertain whether he was in actual possession of the tract.

To rebut the case made by the claimant the government offered in evidence the depositions of several residents of that neighborhood, who swore that they had never heard of the José de Leyba grant, or its boundaries. Objection was made to the reading of these depositions upon the ground that the witnesses named were present in court, and might be sworn orally. It is unnecessary to determine whether the court erred in admitting the depositions under such circumstances, in view of the vague and unsatisfactory evidence on behalf of the claimant of the boundaries and possession of this tract.

Admitting that the documents introduced afforded a sufficient presumption of a continued possession from 1738 to 1834, there was no evidence of the occupation of the land by any member of the Leyba family subsequent to 1839. This fact of

a total absence of any claim to the land made by the last heirs of the occupant, and that the house was allowed to fall into ruins, is strong evidence either that the land was abandoned as not worth cultivating or that a residence there had become too dangerous by reason of the presence of hostile Indians. In this connection the court below found that " the evidence as to the settlement and occupation of the tract purporting to have been granted, continuity of possession, cultivation, residence, improvement, claim of ownership, notoriety of the grant and knowledge of the existence in the community or by the oldest inhabitants now living, is so vague, contradictory and uncertain as to be almost wholly wanting." In the absence of clear evidence to the contrary we deem it our duty to adopt the opinion of the court below in that particular. *United States* v. *Pendell,* 185 U. S. 189, 197.

While in construing these Spanish grants, owing to the loose manner in which they were made, and the boundaries described, we have been extremely liberal, still we are bound to consider that grants of this description, as of all others, must be construed favorably to the government, and the grantee is bound to show not only the grant itself but that the boundaries were fixed with reasonable certainty. *Slidell* v. *Grandjean,* 111 U. S. 412, 437; *United States* v. *Oregon &c. R. R.,* 164 U. S. 526, 539.

3. But conceding that an experienced surveyor, acquainted with the land in that neighborhood, might locate the boundaries of this tract, there is a still more serious difficulty in the evidence of abandonment and the laches of the claimant, which defences may properly be considered together. Under our Anglo-Saxon system of jurisprudence, questions of the abandonment of land by the owner rarely arise, since they are usually sold to a purchaser or to the State for taxes; but the Spanish law recognizes distinctly the right to abandonment. It is stated in 1 Partidas, Law 50, p. 365, that "if a man be dissatisfied with his immovable estate and abandons it, immediately he departs from it corporally, with an intention that it shall be no longer his, it will become the property of him who first enters thereon." See also Hall's Mexican Law, § 1489. The same principle is stated by Escriche, Title " *Abandono de cosas:* "

"If an owner voluntarily abandons a thing, whether personal or real, with intent no longer to count it in the number of his possessions, because it is useless or burdensome, or for mere caprice, he loses his ownership, and the first who occupies it makes it his." We are also referred by counsel to a law of the Departmental Council of New Mexico enacted in 1837, which declares that "every individual who abandons the land upon which he has settled and which he acquired by grant, with the intention of establishing himself elsewhere to live there, and does not leave some one to take his place in ordinary labor, shall lose the real property he had acquired." See also *Landes* v. *Perkins*, 12 Missouri, 238, 256 ; *Sideck* v. *Duran*, 67 Texas, 256.

As there is no testimony tending to show that the Leybas ever sought to resume possession of the land after the death of Juan Angel in 1839, there was at least a presumption of abandonment. Not only is there no evidence tending to show possession of the land by representatives of the original grantee since 1839, but for sixty years thereafter there was no attempt made to assert title thereto. By section 7 of the Private Land Claims act, 26 Stat. 854, "all proceedings" therein "shall be conducted as near as may be according to the practice of the courts of equity of the United States," and by section 13 no claim shall be allowed upon an imperfect title unless "the claimant would have had a lawful right to make it perfect had the territory not been acquired by the United States," and it is one "that the United States are bound, upon the principles of public law, or by the provisions of the treaty of cession, to respect and permit to become complete and perfect if the same was not at said date already complete and perfect." While it is true that we have held that evidence of possession since the date of the treaty cannot be regarded as an element going to make up a title, *Crespin* v. *United States*, 168 U. S. 208 ; *Hayes* v. *United States*, 170 U. S. 637, 653 ; *Hays* v. *United States*, 175 U. S. 248, 259, it does not follow that abandonment of the land and failure to assert a title since the treaty may not operate as a bar. It is clear that, in the establishment of a title as of a certain date, possession subsequent to that date

is of no value ; but considering the title to have been sufficient as of that date, failure to assert such title within a reasonable time thereafter opens the case to the defence of laches.

In *United States* v. *Moore*, 12 How. 209, it was said of a Spanish grant in Louisiana : " We are called on to decide in this case according to the rules governing a court of equity, and are bound to give due weight to lapse of time. The party was under no disability, and slept on his rights, as he now claims them, for nearly fifty years, without taking a single step. He makes no excuse for his long delay, and cannot now get relief by having his title completed. No case has come within our experience, where the obscurity and antiquity of the transaction more forcibly than in the present case, required a court of equity to bar a complainant on legal presumptions founded on lapse of time ; and where the bar should take the place of individual belief." To the same effect are *Gildersleeve* v. *New Mexico Mining Co.*, 161 U. S. 573, and *United States* v. *Martinez*, 184 U. S. 441.

There are facts connected with this case which render the doctrine of laches peculiarly applicable. This land passed into the possession of the United States under the treaty with Mexico of 1848. Possession of the land had then been abandoned by the descendants of the grantees for at least nine years, and probably longer. In 1854, six years after the treaty, a surveyor general was appointed for New Mexico, 10 Stat. 308, whose duty it was to ascertain the origin, nature, character and existence of all claims to lands under the laws, usages and customs of Spain and Mexico, and report to Congress with a view of confirming *bona fide* grants, and giving full effect to the treaty. No action appears to have been taken before him to ascertain the validity or boundaries of this grant, although the act seems to have remained in force until 1891, when the Court of Private Land Claims was created. The public land surveys were extended over the tract in 1861 ; homestead and other entries were made, improvements established, patents secured, mines opened and developed, but no attempt made to assert the rights of the grantee or his descendants. The Court of Private Land Claims was established in 1891, and all persons having imper-

fect titles were required to present them within two years, and all having perfect titles had the right, but were not bound, to apply to that court for confirmation of such title. It was not until 1899 that the petition in this case was filed by a person who appears, in 1895, to have found lineal descendants of the original grantee, from whom he had secured deeds of this abandoned grant, the very existence of which seems to have been forgotten. If this be considered an imperfect grant, the right to file it expired years ago; if it be a perfect grant, as now claimed, we see no reason why the owner may not prosecute his claim in the territorial courts. Without expressing an opinion as to whether this was a perfect or imperfect grant within the meaning of the law, or whether the boundaries might not still be ascertained by a survey, we are satisfied that it is one which the Court of Private Land Claims could not be called upon to confirm, and that, if for no other reason, the petition should be dismissed upon the ground of laches.

The decree of the court below is therefore

*Affirmed.*

(See note on page 504.)