Earl O. McKNIGHT, and Verna Mc-
Knight, his wife, Plaintiffs,

v.

Frances M. BROEDELL, Defendant.

Civ. A. No. 21325.

United States District Court
E. D. Michigan, S. D.

Dec. 13, 1962.

**46**

Robert C. Winter, David P. Wood, Clark, Klein, Winter, Parsons & Prewitt, John C. Cook, Detroit, Mich., for plaintiffs.

Donald P. Schuur, Patrick J. Keating, Schuur & Keating, John H. Yoe, City Atty., St. Clair Shores, Detroit, Mich., for defendant.

Frank J. Kelley, Atty. Gen., Nicholas V. Olds, Jerome Maslowski, Warren R. Snyder, Asst. Attys. Gen., Lansing, Mich., submitted brief for the State of Michigan as amicus curiae in support of defendant.

FREEMAN, District Judge.

This is a diversity action to foreclose a contract for the sale of land in a plat adjoining Lake St. Clair executed on February 2, 1956, between the plaintiffs, as vendors, and the defendant and her late husband, as vendees, based on a failure to make required payments of principal and interest due on and after January 17, 1958. The defendant in her answer and counterclaim for cancellation of the contract and other relief asserts that the State of Michigan claims ownership to a portion of the lands described in the contract and, consequently, plaintiffs cannot convey a marketable title.

Defendant initially maintained that the State was an indispensable party and a motion to dismiss based on that ground was denied without prejudice, which motion was renewed orally at the opening of the trial and is again denied, since defendant now concedes in her briefs that the State is not an indispensable party. A motion of defendant to permit the State of Michigan to voluntarily submit to the jurisdiction of the Court

and to be impleaded as a party defendant was also denied with the consent of the State for the reason that a state is not a citizen of any state and, therefore, if made a party in a diversity action would destroy jurisdiction. However, the State of Michigan was allowed to and did participate in the instant case as amicus curiae and, in such capacity, attended the trial, aided defendant in her case and filed a brief after trial.

The State of Michigan claims ownership to that part of the land described in the contract which allegedly was in 1923 a part of the bottom of Lake St. Clair, a navigable body of water serving as one of the tributaries of the Great Lakes, and which the State contends is within the ordinary high-water mark of the lake, having been filled in sometime subsequent to 1923, thereby converting same into land suitable for building purposes.

The premises described in the land contract are part of the recorded plat of West's Venetian Gardens Subdivision, "being a subdivision of part of * * * lot No. 5 of Abbott's Subdivision of Private Claims 599 and 623." On June 1, 1811, President James Madison executed two land patents confirming and granting to the heirs of James Abbott, plaintiffs' predecessors in title, the lands covered by said Private Claims 599 and 623, pursuant to surveys made by one Aaron Greeley in 1810, each patent containing approximately 640 acres according to such patent descriptions. The exhibits indicate that all of said subdivision purports to be a part of Private Claim 623.

In the case of People v. Broedell, 365 Mich. 201, 112 N.W.2d 517, an action by the State of Michigan to enjoin Broedell, the defendant in the instant case, from filling in or making improvements on two lots fronting on the shore of Lake St. Clair lying only a few feet south of and in another plat adjoining the lots in the instant case, the Michigan Supreme Court held that if the lots were within the confines of Private Claim 623 as patented to Abbott's heirs on June 1, 1811, no title passed from the United States to the State of Michigan upon its admission

into the Union in 1837, even if submerged land at the time, "because then it no longer belonged to the United States but to the Abbott heirs or their successors in title." The lands in question are admittedly within the northerly, westerly and southerly lines of the patent to Private Claim 623, which patent described all four boundaries by courses and distances, the easterly line being described therein as follows: "thence along the border of said lake (Lake St. Clair) S 2° W 54 chains 75 links; thence S 12° E 20 chains 46 links to the P.O.B."

Plaintiffs contend that the westerly line of Private Claim 623 is presently Harper Avenue, formerly known as French Claim Road, and by measuring from Harper Avenue along the north and south lines of the patent the distances stated in the patent description, the patented lands extend easterly into the present waters of Lake St. Clair, a distance of approximately 1300 feet beyond the easterly line of West's Venetian Gardens Subdivision, which thus fixes the easterly line of the patent to Private Claim 623 as of June 1, 1811.

Defendant, in support of her position that plaintiffs cannot convey a marketable title, contends that the patent to Private Claim 623 only conveyed to the patentees and their successors in title, including plaintiffs, land to the border of Lake St. Clair; that they take as riparian or littoral owners; that, as such, they own land only to the ordinary high-water mark of the lake, "whether that mark may move east or west," and the filled-in portion of the land claimed by the State of Michigan being lakeward of such high-water mark, the plaintiffs are not the owners thereof, and such claim by the State has cast a reasonable doubt upon plaintiffs' title so as to make it unmarketable under applicable Michigan law.

These contentions present the primary issue in this case, viz.: is the easterly line of the patent to Private Claim 623 a fixed boundary as of June 1, 1811, as claimed by plaintiffs, or is it a movable line, as indicated by the "ordinary high-

water mark" of Lake St. Clair, as such mark may exist at any given time, as claimed by defendant?

■ The defendant vendee admittedly has the burden of proving her claim that plaintiffs' title is unmarketable. See Dwight v. Cutler, 3 Mich. 566; Daily, et al. v. Litchfield et al., 10 Mich. 29; Allen v. Atkinson, 21 Mich. 351; Baxter v. Aubrey, 41 Mich. 13, 1 N.W. 897. However, the defendant is not required to show that such title is actually bad in order to sustain her burden in this respect, as pointed out by the Michigan Supreme Court in the case of Bartos v. Czerwinski, 323 Mich. 87, at p. 92, 34 N.W.2d 566, at p. 568, where the test to be applied is set forth as follows:

"A title may be regarded as unmarketable if a reasonably careful and prudent man, familiar with the facts, would refuse to accept the title in the ordinary course of business. It is not necessary that the title be actually bad in order to render it unmarketable. It is sufficient if there is such a doubt or uncertainty as may reasonably form the basis of litigation. * * * A purchaser of property entitled to a 'marketable title' may not be required to accept a conveyance if the title is in such condition that he may be required to defend litigation challenging his possession and interest."

As to plaintiffs' emphasis that the contract provided that defendant had examined an abstract of title "and is satisfied with the marketability of the title shown thereby," see Barber v. Lang, 237 Mich. 98, p. 101, 211 N.W. 70, p. 70 where the Court said:

"If the abstract as offered failed to show on its face a merchantable title as agreed upon, the purchaser was not bound to accept a conveyance, even though he may have had previous knowledge of the defects in title, which were, however, of such nature as required some action to be taken by the seller to remedy them."

The parties agree that the primary issue involving the location of the east-erly line of the patent confirming title to Abbott's heirs in Private Claim 623, depends in the first instance on the construction of such patent. Plaintiffs argue that the Michigan Supreme Court has construed the patent in this respect in People v. Broedell, supra, which decision governs the instant case. Defendant contends that the patent was not construed in that case and that the trial court, to whom the case was remanded to determine whether the lands therein involved were within the patent description, must necessarily construe the patent as it relates to the location of the easterly line in order to make the required finding.

This precise issue was not considered or decided by the Court in Broedell. In that case the Court merely held that if the lots involved were within the boundaries of the patent covering Private Claim 623, then no title passed from the United States to the State of Michigan upon its admission into the Union in 1837, even if such lots were submerged land at that time, because then such land no longer belonged to the United States.

■ The parties recognize that a patent is conclusive as against the Government and also as against parties claiming under it and cannot be collaterally attacked by admission of parol evidence to vary or contradict its terms. See Knight v. United Land Association, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974. Therefore, plaintiffs' contention that to accept as the easterly line of the patent in question the present ordinary high-water mark, would violate rights guaranteed to the patentees, plaintiffs' predecessors in title, by Jay's Treaty of 1794, 8 Stat. 116, is not tenable.

■ The question as to the extent of a grant by a federal patent, that is, as to the limit of the land conveyed thereby, is necessarily a federal question, since it is a question which concerns the validity and effect of an act done by the United States and involves the ascertainment of a right asserted under federal law. Borax Consolidated, Ltd. v. Los

Angeles, 296 U.S. 10, 56 S.Ct. 23, 80 L. Ed. 9.

■ It is established law that upon the acquisition of territory from a foreign country, the United States acquires title to tideland (land between the high and low water marks) on a navigable body of water equally with title to the upland, but holds the former in trust for the future states which might be erected out of that territory and that the ownership and right of disposition of such tideland passes to these future states upon their admission into the Union. Borax Consolidated, Ltd. v. Los Angeles, supra; Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; Knight v. United Land Association, supra, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974; Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428; City and County of San Francisco v. Le Roy, 138 U.S. 656, 11 S.Ct. 364, 34 L.Ed. 1096; United States v. Pacheco, 2 Wall. 587, 69 U.S. 587, 17 L.Ed. 865; United States v. Stewart (C.A.9), 121 F.2d 705. There is also the equally well established qualification that this principle is not applicable to tideland which had previously been granted by a former government, a grant which the United States is bound to honor under international law, or is otherwise subject to a previous trust so that no title or right of disposition passes to the future states. Borax Consolidated, Ltd. v. Los Angeles, supra; Shively v. Bowlby, supra; Knight v. United Land Association, supra; City and County of San Francisco v. Le Roy, supra; People v. Broedell, supra, 365 Mich. 201, 112 N.W.2d 517. In other words, a state, when admitted into the Union, becomes entitled to land under navigable water below the high-water mark, and within its limits which has not been previously granted. Mobile Transportation Company v. Mobile, 187 U.S. 479, 23 S.Ct. 170, 47 L.Ed. 266. The so-called Michigan Submerged Land Acts, Act 326 P.A. 1913 (M.S.A. § 13.-701), Comp.Laws 1948, § 322.401 and Act 247 P.A.1955 (M.S.A. § 13.700), Comp.Laws 1948, § 322.701 recognize the validity of these principles.

■ In both the Treaty of Paris of 1763, in which French possessions, including Detroit, were ceded to Great Britain, and Jay's Treaty of 1794, in which English possessions, including Detroit, became part of the territory of the United States, full protection of private property rights was guaranteed. See People v. Jones, 6 Mich. 176, 185, 186. In the instant case, there is no evidence concerning the extent of any prior grant of the land involved by either the English or French Governments. Furthermore, there is a conclusive presumption in a collateral proceeding "that the patent correctly locates the lands covered by the confirmed grant." De Guyer v. Banning, 167 U.S. 723, 744, 17 S.Ct. 937, 944, 42 L.Ed. 340.

■ As contended by plaintiffs, the distances in the patent in issue, using Harper Avenue as the westerly boundary, would place the easterly line of the patent approximately 1300 feet into Lake St. Clair. The patent expressly states that its easterly line is "along the border" of Lake St. Clair. It has been long established that in construing a federal grant, natural monuments prevail over courses and distances. McIver's Lessee v. Walker, 4 Wheat. 444, 17 U.S. 444, 4 L.Ed. 611; Chinoweth v. Haskell's Lessee, 3 Pet. 92, 28 U.S. 92, 7 L.Ed. 614. The reason for the rule was aptly stated by the Court in the McIver's case, 17 U.S. at p. 448:

"The reason of the rule is, that it is the intention of the grant to convey the land actually surveyed, and mistakes in courses or distances are more probable, and more frequent, than in marked trees, mountains, rivers, or other natural objects capable of being clearly designated, and accurately described."

■ It is equally well settled under the common law that a grant from the sovereign of land bounded by the sea, or by any navigable tidewater, does not pass title below the high-water mark, unless either the language of the grant, or long usage under it, clearly indicates that

such was the intention. Shively v. Bowlby, supra, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331. This principle applies regardless of whether the patent has been issued to confirm a private claim. Sena v. United States, 189 U.S. 233, 23 S.Ct. 596, 47 L.Ed. 787; Thomas B. Bishop Co. v. Santa Barbara County (C.A.9), 96 F.2d 198, or whether the course along a navigable body of water has been meandered, St. Paul and Pacific R. R. Co. v. Schurmeir, 7 Wall. 272, 19 L.Ed. 74; Thomas B. Bishop Co. v. Santa Barbara County, supra. Also see Mitchell v. Smale, 140 U.S. 406, p. 414, 11 S.Ct. 819, p. 822, 35 L.Ed. 442, where the Court said:

> "It has been decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary."

A summary of applicable principles of law and the underlying reasons for the rules are set forth at the conclusion of the opinion in the case of Shively v. Bowlby, supra, 152 U.S. 1, 14 S.Ct. 548, 569, as follows:

> "At common law, the title and the dominion in lands flowed by the tide were in the King for the benefit of the nation. Upon the settlement of the Colonies, like rights passed to the grantees in the royal charters, in trust for the communities to be established. Upon the American Revolution, these rights, charged with a like trust, were vested in the original States, within their respective borders, subject to the rights surrendered by the Constitution to the United States.
>
> "Upon the acquisition of a Territory by the United States, whether by cession from one of the States, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people, and in trust for the several States to be ultimately created out of the Territory.

> "The new States admitted into the Union since the adoption of the Constitution have the same rights as the original States in the tide waters, and in the lands under them, within their respective jurisdictions. The title and rights of riparian or littoral proprietors in the soil below high water mark, therefore, are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution.
>
> "The United States, while they hold the country as a Territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high water mark of tide waters. But they have never done so by general laws; and, unless in some case of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the Territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the States, respectively, when organized and admitted into the Union.
>
> "Grants by Congress of portions of the public lands within a Territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high water mark, and do not impair the title and dominion of the future State when created; but leave the question of the use of the shores by the owners of uplands to the sovereign control of each State, subject only to the rights vested by the Constitution in the United States."

█ From the foregoing principles of law, this Court concludes that the patentees, plaintiffs' predecessors in title, took title only to the ordinary high-water

mark of Lake St. Clair. "This does not mean * * * a physical mark made upon the ground by the waters; it means the line of high water as determined by the course of the tides." Borax Consolidated, Ltd. v. Los Angeles, supra, 296 U.S. 10, 22, 56 S.Ct. 23, 29. Having taken title to the high-water mark, the patentee's rights to the land between the high and low water marks were those of a riparian owner. Mitchell v. Smale, supra, 140 U.S. 406, 415, 11 S.Ct. 819, 35 L.Ed. 442.

Therefore, when Michigan was admitted into the Union, title to the land between the high and low water marks passed to it and patentee's rights as a riparian owner were then determined by such state law. Borax Consolidated, Ltd. v. Los Angeles, supra, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9.

It is not clear whether Michigan follows the common law principle that a riparian owner takes title to the high-water mark depending on the location of such mark from time to time. See People v. Broedell, supra, 365 Mich. 201, 112 N.W.2d 517; cf. Hilt v. Weber, 252 Mich. 198, 233 N.W. 159, 71 A.L.R. 1238. However, under the circumstances there is little question that plaintiffs do not have marketable title to the land involved since the State has a very substantial claim to such land.

The Michigan Supreme Court in People v. Broedell, supra, which plaintiffs contend governs the instant case, relied on the cases of Knight v. United Land Association, supra, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974; and Beard v. Federy, 3 Wall. 478, 70 U.S. 478, 18 L.Ed. 88. The Knight case involved a prior Mexican grant of land to the Pueblo of San Francisco. Under Mexican law, a pueblo consists of an area of 4 square leagues. The United States confirmed San Francisco's claim to an area consisting of 4 square leagues with San Francisco Bay as one of the boundaries. Taking such Bay at its ordinary high-water mark as a

boundary, the Court held that this boundary crossed all creeks entering the Bay and all land encompassed within that boundary belonged to the Pueblo and eventually to the City of San Francisco. The Court also held that the patent confirming San Francisco's claim, which the United States was obligated to issue under the applicable principles of international law, could not be contradicted by parol evidence showing a part of the land was below the ordinary high-water mark of Mission Creek when California was conquered by the United States. See City and County of San Francisco v. Le Roy, supra, 138 U.S. 656, 11 S.Ct. 364, 34 L.Ed. 1096, which was followed as directly in point in Knight v. United Land Association, supra. The case of Beard v. Federy, supra, also involved a prior Mexican grant which the United States confirmed pursuant to its duty under international law. Further, the Court held that where a Mexican grant of "Pio Pico" was never confirmed by the United States, the defendants could not introduce evidence of such grant to contradict the patent under which plaintiff claimed.

█ In the instant case there is nothing to indicate that the patentees were entitled to any land below the ordinary high-water mark because of some former English or French grant, or that the United States confirmed title to any land below such high-water mark. Furthermore, this Court is not convinced from the evidence submitted that the shore line of Lake St. Clair in 1811 was approximately 1300 feet east of the present shore line in the vicinity of the property in question. The testimony of plaintiffs' witness, Walter J. Lehner [1] indicates that the shore line has not moved since 1875, and is the same today as it was in 1898,[2] 1923,[3] and 1938.[4] It seems unlikely that so much land would become submerged between 1810 and 1875 and, furthermore, there is a lack of convincing evidence to that effect. A reason-

---

1. Cross-examination, Transcript pp. 323–4.

2. Exhibit H.

3. Exhibit I–1.

4. Exhibit I–1.

able inference can be drawn from the evidence that the land claimed by the State was filled-in land and was lakeward of the ordinary high-water mark in 1923. Even if this Court should accept plaintiffs' contention that the shore line moved some 1300 feet landward between 1810 and 1875 rather than the conclusions that Greeley made such a mistake in his survey, or that some 1300 feet of the westerly part of the patent description came into adverse possession of persons not claiming under Abbott's heirs, the defendant would nevertheless be required to defend her title against an attack by the State. The possibility of such adverse possession would place the westerly boundary of the patent some 1300 feet west of Harper Avenue. The only evidence that supports plaintiffs' contention that Harper Avenue is the westerly line of the patent is the testimony of the witness Lehner, which is not sufficient to establish this point. In this connection it should be noted that Greeley began his survey of the patent description "at a post standing on the border of Lake St. Clair," which is the southeast corner of the description and not the northwest corner of the patented land, the point used by the witness Lehner.

It is clear from all the evidence that there is a reasonable doubt as to the validity of plaintiffs' title to the land claimed by the State as may reasonably form the basis of litigation with respect thereto. Hence, plaintiffs' title to such land is unmarketable under Michigan law. Bartos v. Czerwinski, supra, 323 Mich. 87, 34 N.W.2d 566.

■ Plaintiffs also contended and argued for the first time in their post-trial brief that the State of Michigan is estopped to claim title to the land in question and that a court of equity should not permit the State to deny plaintiffs' title and thereby enrich itself unjustly. These contentions were neither pleaded nor made issues by the Pre-Trial Order and were not raised until the case was submitted after oral arguments. Such contentions are based on the theories that the State approved the plat in issue and its political subdivisions collected taxes from such platted land.

It should be noted that the State does not levy taxes on real property in Michigan. These theories are possible defenses available in an adversary proceeding where the State is a party and, consequently, are defenses which the defendant would have to raise against the State in a subsequent suit defending her title if the plaintiffs should prevail on them here.

■ As previously pointed out, a purchaser of property is not required to accept a conveyance if the title is in such condition that he may have to defend it in subsequent litigation. Bartos v. Czerwinski, supra. Furthermore, estoppel was expressly rejected by the Court in People v. Broedell, supra, 365 Mich. 201, p. 205, 112 N.W.2d 517, p. 519, where the Court said:

"The title of the State to submerged lands in the Great Lakes is impressed with a trust for the benefit of the public. The State has a duty to protect that trust and may not surrender the rights of the people thereto."

Defendant under her counterclaim seeks to recover damages for all sums paid by her and her late husband (1) on principal and interest; (2) for improvements; and (3) for taxes.

■ The parties stipulated the amounts paid by the defendants for principal and interest and taxes under the contract. However, plaintiffs object to defendant's evidence of the sums allegedly paid for improvements on the ground that such evidence was not admissible under the business records doctrine (28 U.S.C.A. § 1732), and was not otherwise connected with the improvements so as to be relevant. The only evidence offered by defendant as proof of this item was some memoranda prepared personally for Mr. Broedell by a Mr. DeHays, a bookkeeper who formerly worked for Mr. Broedell in his business and on occasions performed personal services for him. In order for purported

business records to be admissible into evidence, such records must be prepared in the course of systematic routine office procedures to record information relating to, and to be used in, the routine operations of the business. Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645; La Porte v. United States (C.A.9), 300 F.2d 878; Matthews v. United States (C.A.5), 217 F.2d 409. Since such memoranda were not made pursuant to any systematic routine office procedure relating to, and to be used in, the routine operations of any of Mr. Broedell's business affairs, this Court holds that the plaintiffs' timely objection to this evidence is well founded and that the evidence is inadmissible. Further, any observation by Mr. DeHays of the work done in the course of making the alleged improvements was not made by him until such work was substantially finished and, therefore, even if such observation could have any probative value concerning the cost of the improvements, it certainly does not in the instant case. Such evidence not being admissible, this Court concludes that defendant has not met the requisite burden of proving damages for the alleged improvements.

Michigan recognizes the universal maxim of equity courts that "he who seeks equity must do equity." Dirr v. Hitchman, 260 Mich. 179, 244 N.W. 440. The defendant also seeks damages for taxes paid plus interest thereon. However, this item must be offset by the reasonable rental value due plaintiffs for the use of the land, and absent any evidence of such value, this item is, therefore, disallowed.

Proposed findings of fact and conclusions of law have been submitted by both parties. Defendant's proposed findings of fact are hereby approved. Defendant's proposed conclusions of law shall be re-examined by her in the light of the foregoing opinion to determine whether any conclusions of law not set forth therein are appropriate or necessary.

A proposed judgment in accordance with this opinion may be submitted.