The STATE of Texas, Appellant,

v.

The SUPERIOR OIL COMPANY et al., Appellees.

No. 937.

Court of Civil Appeals of Texas, Corpus Christi.

June 26, 1975.

Rehearing Denied Aug. 29, 1975.

John L. Hill, Jr., Atty. Gen., J. Milton Richardson, Asst. Atty. Gen., Austin, John H. Flinn, Sinton, Richard D. Hatch, III, Aransas Pass, for plaintiff.

Anderson, Smith, Null & Stofer, Victoria, William J. Ayers, The Permian Corp., Hous-

ton, W. Newton Barnes, Mockingbird Tower, W. S. Barron, Jr., Geary, Brice, Barron & Stahl, Dallas, Louis H. Beard, Wells, Duncan, Beard, Greenberg & Hunt, Beaumont, Marshall Boykin, III, Wood, Boykin & Wolter, Corpus Christi, Robert L. Bradley, Andrews, Kurth, Campbell & Jones, Houston, H. A. Burnett, Burnett & Burnett, Sinton, Butler, Binion, Rice, Cook & Knapp, Claude C. Roberts, William S. Clarke, Texaco Inc., Houston, J. W. Cooper, Jr., David M. Coover, Davis & Hale, Dyer, Redford, Burnett, Wray & Woolsey, Corpus Christi, Robert M. Ewing, Ewing & Gerger, Dallas, Samuel L. Fly, Forest Oil Corp., San Antonio, Foy, Cobb, Campbell & Gall, Clifford G. Campbell, Joe H. Foy, Houston, Ralph J. Graham, Corpus Christi, Graves, Dougherty, Hearon, Moody & Garwood, Austin, Head & Kendrick, Corpus Christi, Richard Henderson, Guittard & Henderson, Victoria, Frederic Johnson, Sinton, Allen S. Lawrence, Jr., Ellis, Andrews & Lawrence, Aransas Pass, Warren B. Leach, Jr., William H. Holloway, Marathon Oil Co., Thomas H. Lee, Lee & Babcock, Houston, Fritz L. Lyne, Lyne, Klein, French & Womble, Dallas, Dave McNeill, Jr., Harry M. Reasoner, David T. Harvin, Vinson, Elkins, Searls, Connally & Smith, Houston, Frank R. McWhorter, Tenneco, Inc., Houston, M. W. Meredith, Jr., Meredith & Donnell, Corpus Christi, John H. Miller, Jr., Sinton, Walter B. Morgan, Ezzon Co., U. S. A., B. W. Morris, Sinclair Oil & Gas Co., Houston, William E. Nicholas, Sinton, Clayton L. Orn, Anderson, Brown, Orn & Jones, Houston, D. Dean Patton, Morrill & Patton, Beeville, Roy E. Pitts, J. Harold Goode, Lone Star Gas Co., Dallas, Bernard W. Schrader, Coastal States Gas Producing Co., E. E. Shouse, Herbert W. Varner, R. T. Robberson, The Superior Oil Co., Houston, Milton W. Walton, M. Harvey Weil, Kleberg, Mobley, Lockett & Weil, Corpus Christi, David A. Witts, Dallas, Claude D. Bell, Jr., Dallas, R. J. Delahoussaye, Corpus Christi, J. P. Greve, Jr., Rufus N. McKnight, Jr., Sun Oil Co., Dallas, J. R. Keeling, Corpus Christi, Kliewer & Hood, Dallas, Fred A. Lange,

Austin, Dabney, Northrop & Garwood, Houston, J. R. Sorrell, Sorrell, Anderson & Sorrell, Corpus Christi, Renfro Speed, Hexter-Fair Title Co., Dallas, R. F. Thompson, Fort Worth, Atwood McDonald, McDonald, Sanders, Ginsburg, Phillips, Maddox & Newkirk, Fort Worth, J. Patrick McGloin, Kleberg, Mobley, Lockett & Weil, Corpus Christi, Morrison, Dittmar, Dahlgren & Kaine, San Antonio, Perkins, Davis, Oden & Warburton, Alice, Hubert M. Preston, San Angelo, for defendants.

## OPINION

NYE, Chief Justice.

This is a vacancy case. The cause originated as a suit filed by an applicant, Walter C. Atchley, acting under article 5421c, section 6, Tex.Rev.Civ.Stat.Ann. seeking to purchase 12,068.4 acres of state land. Atchley's application had been rejected by the commissioner of the General Land Office before he filed suit. The State of Texas acting under the authority of article 5421c, section 6(j), Tex.Rev.Civ.Stat.Ann. intervened in the cause as an active plaintiff in trespass to try title, asserting ownership of the area of land claimed to be State lands by Atchley as well as other areas. The purpose of the vacancy suit was to claim the lands for the State of Texas and the public free school fund. Atchley, the individual claimant, was then given statutory priority to purchase the lands from the State of Texas, if he were successful in proving the vacancy. As a result, the State was required to intervene in the suit under Article 5421c, section 6(j). That article reads in part: ". . . *When such litigation shall have been prosecuted to a final judgment, said judgment shall be binding upon the State of Texas. It shall be mandatory for the Attorney General to intervene in behalf of the State in such cases.*" Under the provision of section 6(j) of Article 5421c, the issues to be tried in a vacancy suit are "boundary, title and ownership".

Following the intervention by the Attorney General, the State filed its first amended petition in intervention in which it sought to recover, in trespass to try title, the same 12,003.4 acre tract that Atchley claimed was vacant. In addition, the State sought damages in the amount of $262,523,437 for the oil and gas produced from the subject tract of land.

The trial court ordered the issues and claims of the State asserted in its motion for summary judgment, be severed from Atchley's suit and tried as a separate suit, to be separately numbered and styled on the civil docket of the court as the *State of Texas v. Superior Oil Company*, Et Al, and tried after Atchley's suit had been tried.

The tract of land in question covers almost 5½ leagues of land and is known as the Portilla grant. The State of Coahuila and Texas, on October 23, 1834, in five separate grants, granted to Felipe Rogue Portilla and his six sons 5½ leagues as a part of the Power & Hewetson Colony pursuant to the colonization of this particular area by Mexico in 1834. The State's plea in intervention was in the form of a trespass to try title action naming the same defendants that were sued in Atchley's original suit.

The State filed its second amended petition in the severed cause in which it alleged that it was entitled to recover (in trespass to try title), the 5½ leagues of land known as the Portilla grants in San Patricio County, Texas. On June 24, 1971, the district court entered judgment in the Atchley case in favor of the defendants. Atchley appealed and the Beaumont Court of Civil Appeals affirmed, holding that the subject tract of land was within the boundaries of the 5½ league Portilla grants and therefore was not vacant land. The Supreme Court refused the application for writ of error, *N.R.E. Atchley v. Superior Oil Company*, 482 S.W.2d 883 (Tex.Civ.App.—Beaumont 1972, writ ref'd n. r. e.).

Following the affirmance of the judgment in the original Atchley case, the defendants filed their Motion for Summary Judgment along with the State's Motion for Summary Judgment. The motions were heard on August 23, 1974 by the District Court. The defendants' Motion for Summary Judgment (which for all practical purposes answers the State's motion), included as its grounds the following: (1) that titles to the land in question originally granted to Portilla were vested in defendants under various conveyances; (2) that the course of conduct of the duly authorized officers of the State of Texas, with regard to ancient grants, have, by their failure to act for 130 years, raised a conclusive presumption that the grants were validly issued and that the Portillas have performed all conditions, precedent and subsequent, for ownership; (3) that the judgment rendered in *Atchley v. Superior Oil Company* in which the State had intervened is res judicata and thus, bars the claim the State now makes; (4) that Portilla and his sons did not abandon their land and establish themselves in Mexico because the law conclusively presumes at this late date that no such abandonment took place; (5) that the removal from the Republic of Texas to Mexico by the Portillas did not ipso facto vacate title to the land the Portillas acquired under the colonization laws; (6) the State's claim that the Portillas failed to occupy the land for six consecutive years is without merit; (7) the law presumes that the Portillas did not leave Texas to avoid participating in the Texas War; (8) that the Portillas were not aliens of the land; (9) the law presumes at this late date that all monies due and owing on the land in question were paid, and that the land did not escheat to the State of Texas; (10) the State's claim that two of Portilla's sons were not residents was without merit; and (11) the Courts of Texas have long accepted as valid the Portilla grants.

The District Court entered its judgment holding that the State's Motion for Summary Judgment be denied, and sustained the defendants' Motion for Summary Judgment. The trial court adjudged that the

State of Texas take nothing by its suit against the defendants. The State brings this appeal from that summary judgment.

The trial court did not indicate upon which of the eleven grounds alleged in the defendants' Motion for Summary Judgment that it based its judgment, whether it be one or all. For that reason, the State of Texas argues in its brief against each ground asserted in defendants' Motion for Summary Judgment contending that each is without merit. The State contends that the trial court erred in granting the defendants' Motion for Summary Judgment and contends alternatively that the State's Motion for Summary Judgment should have been granted. It prays that the judgment be reversed and rendered accordingly, or in the alternative that the case be reversed and remanded to the District Court for trial on the merits.

In Summary Judgment cases where the merits of the case have not been reached and the summary judgment rests upon the proof before the Court, the question on appeal as well as in the trial court is not whether the summary judgment proof raises fact issues with reference to the essential elements of the State's claim or cause of action, but whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact as to one or more of the essential elements of the State's cause of action. *Gibbs v. General Motors Corporation*, 450 S.W.2d 827 (Tex. Sup.1970). The provisions of Rule 166–A, Texas Rules of Civil Procedure are applicable to the State, as well as to the defendants who moved for summary judgment. The summary judgment for the defendants can stand only if it is apparent from the record that there are no genuine issues as to any material fact and that the defendants are entitled to a judgment as a matter of law. *Great American Reserve Insurance Company v. San Antonio Plumbing Supply Company*, 391 S.W.2d 41 (Tex.Sup.1965).

At the outset we pause to mention the rule of law that was stated in *Blaffer v.*

*State*, 31 S.W.2d 172, 191 (Tex.Civ.App.— Austin 1930, err. ref'd). The Court there said: "The public policy of this state, as announced in repeated decisions, demands the security of land titles emanating from the state, and, where ancient boundary lines have been recognized for long periods of years, they will not be lightly disturbed, to the detriment of those who have dealt upon the faith of them . . . Property rights, extending into the millions of dollars, are based upon that location and its recognition."

The defendants have set out several theories as a basis for the granting of the summary judgment in the trial court. They can be summarized into four basic categories: (1) the prior decision of *Atchley v. Superior Oil Company*, 482 S.W.2d 883 (Tex. Civ.App.—Beaumont 1972, writ ref'd n. r. e.) is res judicata as to the issues of abandonment and forfeiture; (2) the State's course of conduct with regard to the failure of its duly authorized officers of the State of Texas to act with regard to ancient grants for a period of time in excess of 130 years, raises a conclusive presumption that the grants were validly issued and that the Portillas had performed all conditions, precedent and subsequent, for ownership; (3) there was no abandonment by the Portillas in that the removal from the Republic of Texas did not ipso facto vacate title to the lands that the Portillas acquired under the colonization laws; and (4) that even if there was an abandonment, the land did not escheat to the State, but went to the first taker.

The record before us is voluminous. It is virtually impossible to refer to all of the instruments, exhibits, maps and plats which make up the Summary Judgment proof. Exhibits number X and Z, for instance, contain the respective briefs of the parties in the Beaumont Court of Civil Appeals as well as the opinion of that Court. These exhibits also include the briefs of the parties in the Supreme Court and Atchley's and the State's joint application for writ of error.

We summarize most of the pertinent facts from the briefs of the appellant and appellees. These facts have been checked with the evidence in the record for accuracy. The lands which we call the Portilla 5½ league grants are a part of a larger tract of 7½ leagues which is the same land that the parties in *Atchley v. Superior* and the Beaumont Court referred to as the Portilla 7½ league grant. This 7½ league grant is a body of land in San Patricio County bounded on the north by the Aransas River and on the south by the Chiltipin Creek. All of the 7½ leagues were granted to Felipe Rogue Portilla and his six sons except two parcels, one of which was granted to Miguel Musquiz for one league, and another for one league was granted to Antonio Gozeascochechea, the son of Maria Jacinta de la Garza. The 5½ leagues granted to Portilla and his six sons were bounded on the east by another 5½ league tract granted to the empresarios Power & Hewetson and on the west by the two leagues granted to Musquiz and Gozeascochechea. The 5½ league tract was divided into three parcels. One to Felipe Rogue Portilla, another parcel of four leagues was granted to four of Portilla's sons and a third parcel for ½ of a league was granted to two of his other sons. The grants to Portilla and his sons were made by the State of Coahuila and Texas on October 23, 1834. Portilla and his sons stated in their applications (for their three grants of land), that two years prior to their applications (which were dated September 11, 1834), they introduced stock into the colony and set up and occupied a ranch on the Aransas River. Each of their titles recite that the lands granted were adjudicated to the colonists named in the grant; that he was put into possession; that he took possession "quietly and peacefully without contradiction and performing all the acts of real and true possession; having been informed that within one year he shall construct fenced boundaries and shall observe that part of the colonization law which pertains to them". The original grants were deposited in the General Land

Office in the Republic of Texas on November 1, 1937, and have been of record in that office or in the Spanish Archives of the General Land Office of the State of Texas ever since. The Beaumont Court of Civil Appeals said in Atchley: (begins at page 892) "We are of the opinion that the doctrine of juridical possession clearly is applicable to grants made by the government of Coahuila and Texas." Citing many cases, the Court concluded its discussion of juridical possession by quoting from *Harris v. O'Connor*, 185 S.W.2d 993 (Tex.Civ.App.— El Paso 1944, err. ref'd w. o. m.) which we also quote in part: ". . . This answer (no vacancy) is justified by over one hundred years of acquiescence by the Governments of Coahuila and Texas, the Republic of Texas, and the State of Texas; not only by acquiescence, but by numerous other particular acts, particularly by the State of Texas . . ." We also hold that there is no vacancy, unless, as the State contends, there are fact issues of abandonment or forfeiture. We, therefore, proceed to discuss all of the State's contentions in this appeal.

Prior to 1967, when Atchley instituted his vacancy action and the State of Texas filed its intervention, the validity of the Portilla grants was never questioned by any authorized officer of the State of Coahuila and Texas, the Republic of Texas or the State of Texas, although the grants have been of record ever since they were issued on October 23, 1834. John Welder, the husband of a granddaughter of Felipe Rogue Portilla (who was also a daughter of the empresario), and John Welder's successors in title have been in exclusive and uninterrupted possession of the 5½ league grants for more than 115 years. Welder acquired the lands, except as to interest owned by his wife, from the surviving sons of Felipe Rogue Portilla and their devisee heirs and the devisee heirs of Felipe Rogue Portilla through numerous deeds executed between 1855 and 1859.

Although the State of Texas, from the day of its independence until the Atchley

suit, has never questioned the subject titles, others have. Following a series of litigation, the Texas Courts have accepted the Portilla grants as muniments of title. The history of all of these title suits are set out in detail by Justice Keith, writing in Atchley. It is not necessary for us to discuss these cases again, however, we here make reference to his discussion and holdings beginning on page 885 which we adopt. *Atchley v. Superior Oil Company,* supra. The Beaumont Court reviewed the same summary judgment proof and held that the lands which Atchley claimed then and the State of Texas claims now were not vacant lands as a matter of law, but were titled to the Portillas by the Mexican Government.

In *Atchley,* the vacancy claimant alleged that the tract of land known as the Portilla grant was vacant land. At issue between the parties in *Atchley* was the true location upon the ground of the divisional line between the 7½ league Portilla grant and the 5½ league Power & Hewetson grant, both of which are located between the Aransas River on the north and the Chiltipin Creek on the south. The State in its petition of intervention contended, among other things, that the Portillas had abandoned their lands and had abandoned the Republic of Texas and established themselves in Mexico. In the State's Motion for Summary Judgment, it included these same grounds as a basis for recovery of the land in question. Likewise, in Atchley's boundary issue, Atchley made the same contentions. In the *Atchley* case, the State of Texas and Atchley filed a joint brief in the Beaumont Court of Civil Appeals to the effect that even if the Appellate Court were to sustain the defendants' contentions (relating to the boundary issue), the State was still entitled to the land involved because the Portillas had abandoned their lands with the intention of not claiming them afterwards. In the State's reply brief in the Beaumont Court, the State said, "It's very important that this Court (the Beaumont Court of Civil Appeals) rule upon the 'abandonment' issues involved in this case

. . . ." The Beaumont Court did rule on the abandonment issues and decided the issues against the State of Texas and Atchley. The Beaumont Court stated that "This theory (abandonment) of the plaintiffs is advanced under their eighth point which we reproduce in the footnote. By a laborious process of sifting through the mass of pleadings and 'summary judgment proof' we learn that one of the principal bases of the contention so advanced is that Dolores Portilla Power, the daughter of Felipe de la Portilla and mother of the first John Welder's wife, wrote a letter in July of 1836 to her husband wherein she said:

> 'Ever since the . . . Indians killed my brother at the ranch, . . . my father decided to abandon everything and c(om)e with the whole family to this [town] of Matamoros where we arrived on the eighth day of last June with much difficulty.' "

The issues presented with respect to abandonment and escheat in the above quoted portion of the Beaumont Court's opinion are the same that the State of Texas is now requesting that we decide for a second time.

█ Whenever the State of Texas enters a Court as a litigant in a case, the rule of res judicata applies to it with equal force as to a private litigant. *Trigg v. Whittenburg,* 129 S.W.2d 472 (Tex.Civ.App.—Amarillo 1939, writ ref'd). Article 5421c section 6(j) reads in part: "When such litigation shall have been prosecuted to a final judgment, said judgment shall be binding upon the State of Texas". The issue of abandonment and forfeiture and/or escheat were all considered and disposed of in *Atchley v. Superior Oil Company,* supra.

The Supreme Court was called upon to test the effect of a matter previously determined in *Abbott Laboratories v. Gravis,* 470 S.W.2d 639 (Tex.Sup.1971). The Court said with Chief Justice Greenhill writing: "The Latin phrase 'res judicata' means that the matter has been adjudged; a thing judicially determined; or a matter settled by judg-

ment. The principal of res judicata is an old one founded upon public policy. Its function is to expedite justice by putting an end to litigation and to preserve the sanctity of judgments. As relevant here, an existing final judgment rendered upon the merits by a court of competent jurisdiction upon a matter within its jurisdiction is conclusive of the rights of parties in all other actions on the points at issue and adjudicated in the first suit."

In a similar suit to that which is before us, in which the State of Texas in a trespass to try title action was attempting to overturn a summary judgment in a vacancy case where the issues had been previously raised or could have been raised in a companion suit, this Court decided the case against the State based in part on the doctrine of res judicata. *State v. Sunray DX Oil Company*, 503 S.W.2d 822 (Tex.Civ.App. —Corpus Christi 1973, writ ref'd n. r. e.). This Court held that the doctrine of res judicata operates to preclude a litigant (the State of Texas) from relitigating an issue which had been previously raised or could have been raised and decided against it. We said there, as well as in *Marange v. Marshall*, 402 S.W.2d 236 (Tex.Civ.App.— Corpus Christi 1966, writ ref'd n. r. e.) that: "The general principal, announced in numerous cases, is that a right, question, or fact, distinctly put in issue and directly determined by a court of competent jurisdiction as a ground of recovery or defense cannot be disputed in a subsequent suit between the same parties *or their privies*, or with another so identified in interest with such person that he represents the same legal right, the same question, the same particular controversy or issue which has been necessarily tried and finally determined upon its merits by a court of competent jurisdiction in a judgment in personam in a former suit." (Citing authority.) Speaking of the effect and meaning of the rule of res judicata, the Supreme Court of Texas said in *Houston Terminal Land Co. v. Westergreen*, 119 Tex. 204, 27 S.W.2d 526 (1930), "It is a finality as to the claim or

demand in controversy, concluding parties and those in *privity* with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

We hold that the State of Texas is now barred from reasserting its claim with respect to all of those questions disposed of by the *Beaumont Court in Atchley v. Superior Oil Company*, supra. For that reason, the trial court's action in granting defendants' Motion for Summary Judgment was not error.

Notwithstanding the fact that the State's claims with respect to abandonment and escheat or forfeiture are barred by the doctrine of res judicata, the action by the trial court in granting defendants' Motion for Summary Judgment was correct for still another reason. The defendants contend that the course of conduct by the State of Texas for the past 135 years with regard to those ancient grants made to the colonies by a predecessor sovereign, including the failure of the officers to lay claims to the lands until Atchley filed this action, raises, as a matter of law, a conclusive presumption that the grants were validly issued and that there is no condition, either precedent or subsequent, imposed by law on the grants that were breached by the colonists that would give rise to a forfeiture of the grants or an escheat of the land to the State of Texas.

According to certain exhibits which are a part of the record, the validity of the Portilla grants prior to the Atchley suit has never been questioned by any authorized officer of the State of Coahuila and Texas, the Republic of Texas, or the State of Texas, although the grants have been of record since they were issued originally. In *United States v. Devereux*, 90 F. 182, 187 (Cir. C.A. 4th Cir. 1898), the Court was considering a claim by the United States to certain land which it claimed under an instrument executed in the year 1816. The land own-

ers had gone into possession of the land in 1829 and had been in possession for over 60 years. The Court said in disposing of the claim by the sovereign:

"The present proceedings, seeking to enforce the performance of his duty by the trustee, commenced 21st August, 1893, against them, after a period of actual, continuous, open, adverse possession for over 60 years. During all that time there has been no entry or possession by the trustee or any one claiming under him. Were he now to attempt to execute his trust, and to enter and offer for sale these lands, or to bring his action of ejectment therefor, or were his cestui que trust to adopt the course suggested in 2 Lewin, Trusts, 868, as the only course to be adopted, and bring the action in the name of the trustee, such an action must, of necessity, fail. *After this great lapse of time, courts will presume anything and everything to have been done which, if done, would be a bar to the claim.* Id. 869; *Roe v. Ireland,* 11 East, 280. *This rule of presumption is one of policy as well as of convenience, and necessary for the peace and security of society."* (emphasis supplied).

■ This Court had occasion to discuss the law with respect to presumptions in *Page v. Pan American Petroleum,* 381 S.W.2d 949, 954 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n. r. e.), cert. denied, 382 U.S. 820, 86 S.Ct. 45, 15 L.Ed.2d 66. In discussing the question of presumption from the standpoint of the rule laid down by Judge Wheeler, in *Baker v. Coe,* 20 Tex. 429, 437 (1857), we quoted from the opinion wherein it stated: "Presumptions must be indulged in favor of those proceedings, especially when they are ancient, and titles have been acquired and transmitted under them, or it would indeed be true that time, instead of healing, as it should, the defects of these titles, would gradually undermine, and eventually destroy them." In summarizing, Judge Green of this Court said: "If the necessity for a legal presumption existed back in Justice Wheeler's time, it is

many fold more essential today." We again adopt this language.

■ Ordinarily, such a presumption is one of fact, but as the court said in *Clements v. Texas Co.,* 273 S.W. 993, 998 (Tex. Civ.App.—Galveston 1925, writ ref'd):

". . . but such a presumption, having to do with a transaction 80 years in the past, becomes, for all practical purposes, one of law, for generally the great age which raises the presumption also obliterates the evidence which might have overthrown it."

Stated in a different way the former great Chief Justice of the San Antonio Court of Civil Appeals, the Honorable W. O. Murray, said in *State v. Indio Cattle Co.,* 154 S.W.2d 308 (Tex.Civ.App.—San Antonio 1941, err. ref'd, w. o. m.):

"In boundary, excess or vacancy suits involving old grants and old surveys, where no living witness can testify as to original conditions and facts; the courts, wherever there is specific, definite evidence of facts existing as of the date of the grant or survey, as opposed to general, indefinite or descriptive evidence, decide such cases usually as a matter of law rather than fact. (citing authorities)."

■ The law presumes that a public official has rightfully performed his duty. *Anderson v. Polk,* 117 Tex. 73, 297 S.W. 219 (1927). In the case of *Harris v. O'Connor,* 185 S.W.2d 993 (Tex.Civ.App.—El Paso 1944, writ ref'd w. o. m.), wherein the Court commented upon the legislative enactment making it the duty of the Attorney General to institute suits on behalf of the State to recover the public lands, the Court spoke of the illustrious men who had served in the office of the Attorney General of Texas, naming some 21 in number. The Beaumont Court in *Atchley* added to the 21 Attorney Generals, 6 additional men that the Court considered likewise to be "honored, distinguished and abled gentlemen", who, "are presumed to have discharged their official duty with fidelity and diligence." The

Beaumont Court stated further in *Atchley*: "The presumption which we apply here does not depend on the lapse of time alone. The fact here presumed is that the grants from the State of Coahuila and Texas included the area claimed by the defendants. The basis of such presumptions is, as we have indicated earlier, the course of conduct on the part of the duly authorized officers of the State of Texas inconsistent with any other reasonable conclusion. *Harris v. O'Connor, supra.*"

The State of Texas cites the following cases as its authority for its contention that such presumption is not applicable to them. *Texas Company v. State,* 154 Tex. 494, 281 S.W.2d 83 (1955); *Humble Oil and Refining Co. v. State,* 162 S.W.2d 119 (Tex.Civ.App. —Austin 1942, writ ref'd); *Weatherly v. Jackson,* 123 Tex. 213, 71 S.W.2d 259 (Tex. Comm'n App.1934, opinion adopted). These are the same cases that the State asserted in its application for writ of error in *Atchley v. Superior Oil Company, supra,* in which our Supreme Court refused the writ (no reversible error) considering as they must that such authorities were not controlling.

■ Subsequent to the time that the State of Coahuila and Texas granted to Portilla the lands in question, our Texas Courts have accepted the Portilla grants as valid existing grants. The Supreme Court of Texas has written twice on questions involving the validity of the Portilla grants and in both cases held that there were no vacant lands within the boundaries of such grants. *Welder v. Carroll,* 29 Tex. 317 (1867); *Welder v. Hunt,* 34 Tex. 44 (1870); and see *Atchley v. Superior Oil Company, supra.* We therefore hold that such presumptions are applicable here. However, we believe it should be specified to what extent such presumptions apply to the case at bar.

The State claims, among other things, that the Portillas failed to cultivate or occupy their land for six consecutive years; that Portilla forfeited his title for failure to pay the government dues owed on the land; and that two of Portilla's sons never became residents and thus had no power to receive any land grants. Applying the rule as stated in *Devereux, supra,* that: "after this great lapse of time, courts will presume anything and everything to have been done which, if done, would be a bar to the claim", against the claims stated above, we hold that the Portillas abandoned neither the land, nor the country. They did not fail to cultivate or occupy their land, as contended. They did not leave the country in order to avoid participation in the Texas War and they did not fail to become residents of the State of Coahuila and Texas. In summary, the Portillas did not breach any conditions expressed by law on their grant which would give rise to the forfeiture of the grant by a subsequent sovereign or that would cause their lands to escheat to the State.

■ Concerning abandonment, we have already held that the State is barred from reasserting its claim (res judicata) and that a presumption, exists which predisposes the State's theory. However there is still another reason for affirmance. The summary judgment evidence shows that as a matter of law the State has no claim to the lands in question. The State claims that the Portillas and their sons abandoned the land, which if true, according to the State, would cause the land to escheat to the sovereign. The doctrine of abandonment found its basis in "De Partidas", which was compiled and published under the provisions of a royal order made in 1255 A.D. See *Allen v. West Lumber Company,* 244 S.W. 499 (Tex. Comm'n App.1922, Judgment adopted). The work was not officially promulgated until the year 1515 when it received the royal sanction of the Cortes, held in the City of Toro. The work takes its name "De Partidas" from its division into seven parts and contains fundamental principals of the law of Spain. In 1819, the legislature of Louisiana authorized the translation and compilation of all that portion of the Partidas that was considered to have the force of

law in that commonwealth. Pursuant to that act, there was published "The Laws of Las Siete Partidas". (The seven parts). The applicable doctrine stated in Partidas is set out as follows:

"If a man be dissatisfied with his immovable estate and abandon it, immediately he departs from it corporeally, with an intention that it shall no longer be his, *it will become the property of him who first enters thereon.*" Partidas 3, Title 4, Law 50. (Emphasis supplied).

It has always been the law of this State that Spanish and Mexican grants are governed by the law in effect at the time when they were made. *State v. Valmont Plantations,* 346 S.W.2d 853 (Tex.Civ.App.—San Antonio 1961), aff'd, 163 Tex. 381, 355 S.W.2d 502 (1962); *Miller v. Letzerich,* 121 Tex. 248, 49 S.W.2d 404 (1932); *Allen v. West Lumber Company,* supra; *Manry v. Robison,* 122 Tex. 213, 56 S.W.2d 438 (1932); *State v. Balli,* 144 Tex. 195, 190 S.W.2d 71, 99 (1944). Thus, we are required to apply the law that was in effect at the time of the grants to the Portillas, and the law in effect at the time of the alleged abandonment. That being the case, we are governed by the law as incorporated in Las Siete Partidas as it was in effect at the time of the Portilla grants.

The above quoted provision clearly provided that upon abandonment title passes to the first entrant thereon without escheating to the sovereign. *Sydeck v. Duran,* 67 Tex. 256, 3 S.W. 264 (1887); *Allen v. West Lumber Company,* supra; *Foster v. Gulf Oil Corporation,* 335 S.W.2d 845, 848 (Tex.Civ. App.—Beaumont 1960, writ ref'd n. r. e.); *Sena v. United States,* 189 U.S. 233, 23 S.Ct. 596, 47 L.Ed. 787 (1902). In *Harris v. O'Connor,* 185 S.W.2d 993 (Tex.Civ.App.— El Paso 1944, writ ref'd w. o. m.), the Court in referring to the above quoted portion of the Partidas stated:

"This provision of the Partidas does not seem to provide that title to land upon abandonment shall vest in the State. It seems to be in accordance with the common law as to the abandonment of corporeal personal property."

■ Thus, even if it is held that the Portillas did abandon their lands, John Welder, to whom they conveyed the lands, and his successors in title, would prevail, as he was the first person to enter of record after the alleged abandonment.

■ The Appellant State of Texas next asserts that because the Portillas abandoned the Republic of Texas in 1836 and established themselves in Mexico, their titles terminated ipso facto and the lands became vacant lands. The State bases its contention, with respect to the land escheating to the Sovereign, on Art. 30 of the Law of Colonization of the State of Coahuila and Texas of 1825, which reads as follows:

"Art. 30.—The new settler who shall determine on quitting the State, in order to establish himself in a *foreign country,* shall be allowed so to do, together with all his property, but in this case shall not retain his land, and if he has not previously sold it, or the sale been effected agreeably to the 27th Article, it shall be again considered as wholly belonging to the State." (Emphasis added).

The appellant contends that the "State" referred to in Art. 30 was necessarily the Republic of Texas; and Mexico was necessarily a "foreign country" within the meaning of Art. 30, and any person who left Texas after March 2, 1836, and established himself in Mexico established himself in a "foreign country" within the meaning of Art. 30 of the colonization law of March 24, 1825, resulting in the automatic reversion of his land to the public domain. We do not agree. In *Kilpatrick v. Sisneros,* 23 Tex. 113 (Tex.Sup.1859), the Supreme Court having before it a similar question to that before us here, with respect to abandonment of the country, stated:

"Thus the condition upon which, by the law of the grant, the land was to become vacant, was that the colonist should have

established himself in a foreign country; *that is, of course, a country foreign to the Republic of Mexico.* This was the condition annexed to the grant, by the law of the contract between the government and the grantee. The law entered into and formed a part of the contract, and bound the government to respect the title of the grantee, *so long as he remained domiciled within the republic of Mexico."* (Emphasis added).

In *Grassmeyer v. Beeson,* 18 Tex. 753 (1875), the Court stated that the removal of the grantee from this to another of the states of the Mexican Confederacy in 1833 was not an abandonment of the country, within the inhibition of the 30th article of the colonization law of the 24th of March, 1825. See also *Atchley v. Superior Oil Company,* supra, 482 S.W.2d at 903, 904; *Maxey v. O'Connor,* 23 Tex. 234 (1859); *Musguis v. Blake,* 24 Tex. 461, 466 (1859); *Harris v. O'Connor,* supra. From the above authorities, it has been well settled that a removal to Mexico from Texas was not a removal to a "foreign country" as contemplated by Article 30 of the colonization law.

The State of Texas asserts as its primary authority, the case of *Heirs of Holliman v. Peebles,* 1 Tex. 673 (1846), in support of its contention that abandonment of the country ipso facto vacated the lands resulting in it being restored to the sovereign. In this case the government of Mexico, in 1824, granted to Holliman certain lands. Holliman remained most of the time in Mississippi in the United States and kept most of his property there. Upon the question of abandonment being asserted against Holliman, the court found that Holliman had in fact abandoned the country by "removing himself beyond the limits of the Republic of Mexico" to Mississippi in the United States. The court even refers to Mississippi as a foreign state. Such case is clearly not in point. The Portillas, by allegedly removing themselves to Mexico, were not beyond the limits of the Republic of Mexico.

It should be remembered that this precise question was presented to the Beaumont

Court of Civil Appeals in *Atchley,* supra, 482 S.W.2d at 903, 904. The Court in summary held:

"Insofar as our record discloses, John Welder was the first one who entered upon the land after it had been abandoned, if it was, by the Portillas. Plaintiffs may not prevail upon their theory of abandonment. For, as was said in *Hanrick v. Dodd,* supra (62 Tex. 75 at 89):

'Under Mexican Law, as under the common law, an estate granted by the government cannot afterwards be divested upon mere surmise or suggestion. A formal conveyance, or a regular proceeding, is requisite.'

There has never been either a formal conveyance or a regular proceeding divesting the Portilla title to the land involved herein."

■ Even if an abandonment of the land or of the country had occurred, the land does not ipso facto escheat to the State. Some type of proceeding, in which the land is judicially divested, is a requisite. There is, therefore, no issue of fact as to abandonment of the land or removal to a foreign country in this case.

The State of Texas next asserts that the Portillas failed to *cultivate* or occupy their lands for a period of six consecutive years from October 23, 1834, to October 23, 1840, as required by Articles 26 and 27 of the colonization law of March 24, 1825, with the result, provided in such law, that their titles escheated and were forfeited. Articles 26 and 27 found in Decree No. 19 of the colonization law of 1825 reads as follows:

"Art. 26—It shall be considered, that the many settlers who within 6 years from the date of their grant have not cultivated or occupied according to its quality the land which has been granted to them, have renounced their rights, and the proper civil authority shall resume the grant and the title deeds."

"Art. 27—The projectors, and military men, of whom previous mention has been

made, and those who have purchased lands, can sell their lands at any time, on condition that the purchaser oblige himself to cultivate them within the period in which the original possessor ought to do so, including also the time which they have been in his hands; the other settlers may sell theirs when they have cultivated them wholly, and not before that time." See 1 Gammel, Laws of Texas, p. 103.

As we have previously held, there necessarily exists a presumption that after a period of 135 years the Portillas did not breach any conditions expressed by law on their grants, which would give rise to a forfeiture of the grants by a subsequent sovereign. Notwithstanding such presumption, there are further reasons why the State's claim against the lands for the alleged failure of the Portillas to cultivate the same, causing an escheat, is without merit.

The summary judgment evidence shows that the Portillas received their land grant October 23, 1834. However, Article 38 (Decree No. 190) of the colonization law of April 28, 1832, stated: "Decree No. 16 of the 24th of March 1825, is hereby repealed." There does not appear to be any requirement that a settler must cultivate his property within 6 years, but on the contrary, it provides in one of the articles for disposal of one's land, although it has not been cultivated. That article, being article 31 states:

"Every new settler from the time of his settlement, shall be permitted to dispose of his land, *although it shall not be cultivated,* by testament made in conformity to the laws that are now, or shall be hereafter in force; and should he die intestate, his lawful heir or heirs shall succeed him in the enjoyment of his rights and property, assuming in both cases the obligations and conditions incumbent on the respective grantee."

Article 19 of the colonization laws of 1832 provides that "No new settler, Mexican or foreigner, shall under any title or pretense sell or alienate the land or water

that falls to his share, until after six years from the time of taking possession." However, the State is only complaining that the Portillas failed to cultivate their lands within six years. The obligation to cultivate the lands for a certain period did not exist at the time the Portillas received their grant. It also appears that this restriction upon alienation, contained in Articles 26 and 27 of the decrees of March 24, 1825, was removed by the thirty-sixth article of the Decree No. 272, Section 3, on March 26, 1834 (1 Gammel, Laws of Texas, p. 362). See also *Sydeck v. Duran,* supra, 3 S.W. at 266. The grants to the Portillas were executed in October of 1834 after said restrictions as to cultivation had already been removed; thus, the Portilla grants were not subject to these restrictions at the time of their execution.

Even if it could be said that the grants to the Portillas were subject to such conditions (cultivation and occupancy), such were removed by Section 24 of an Act of December 14, 1837, Laws of the Republic of Texas (1 Gammel, Laws of Texas, p. 1413). Section 24 provides in pertinent part:

"Sec. 24. Be it further enacted, That whereas many persons have received titles under the colonization laws as colonists from the different commissioners of the country, and whereas many conditions were by law attached to said titles, that *all such conditions be, and are hereby cancelled, and the titles to all such lands are hereby ratified and confirmed."* (Emphasis added).

We hold that the trial court was not in error in entering summary judgment for defendants. The Portillas breached no conditions causing a forfeiture of their land.

The State of Texas next claims that the Portillas left the country to avoid participation in the Texas War for Independence or refused to participate in such war, or gave aid or assistance to the Mexican side, as a result of which they forfeited their titles. Here too, there exists a presumption that after a period of approximately 135 years,

the Portillas did not leave the country to avoid participation in the Texas War. Appellant claims that the basis for its contention is Section 8 of the General Provisions of the Constitution of the Republic of Texas which reads as follows:

"Sec. 8. All persons who shall leave the county for the purpose of evading a participation in the present struggle, or shall refuse to participate in it, or shall give aid or assistance to the present enemy, shall forfeit all rights of citizenship, and such lands, as they may have in the Republic."

The State bases its right to a forfeiture on Article 13 § 1 of the Texas Constitution. This right of forfeiture accrued, if at all, to the Republic of Texas, at the revolution and to the State of Texas when it became a state.[1]

Even if it can be alleged that the Portillas removed themselves to Mexico for the purpose of evading participating in the war, that allegation in and by itself would not cause a forfeiture of their lands without their "Day in Court". It is a rule that is as old as the law itself, and never more to be respected than now, that no one shall be personally bound until he has had his day in Court. *Marange v. Marshall*, supra. In fact, it is well that we recall the possible origin of the maxim as did the Court in *In re: Cumberland Power Co.*, 147 Tenn. 504, 249 S.W. 818, 821. The Court said:

"It is fundamental that every man have his 'day in court,' and we have no doubt that an appropriate procedure exists, for, as quaintly observed by an ancient English judge, in the case of *Rex v. Mayor of Oxford*, Palmer, 453: 'The laws of God

and man both give the party an opportunity to make his defense, if he has any. I remember to have heard it observed by a very learned man upon such an occasion that even God himself did not pass sentence upon Adam, before he was called upon to make his defense. "Adam," says God, "where art thou? * * * Hast thou eaten of the tree whereof I commanded thee that thou shouldest not eat?" And the same question was put to Eve also.'"

In *Kilpatrick v. Sisneros*, 23 Tex. 113, 125 (1859), the court in discussing a removal by a certain citizen to Mexico in order to avoid participation in the war, stated:

"They may have forfeited their right of citizenship and their title to their lands, *but until the forfeiture has been ascertained and adjudged by some proceeding*, to be authorized by law for that purpose, their civil *status* is not changed, nor their rights of property divested." (Emphasis supplied).

* * * * * *

"The terms of the provision leave no room to doubt, that the denunciation of forfeiture, was directed against those who should adhere to the Mexican cause, in the then struggle for independence; but, until the forfeiture was incurred and adjudged, all who were residing here, at the date of the declaration of independence, were, in the language of the constitution, to 'be considered citizens of the republic, and entitled to all the privileges of such'. Adhering to the cause of Mexico, and going there to reside, did *not, ipso facto, and without any action taken to declare the forfeiture by the government*, make them aliens, or vacate their titles,

---

1. See Interpretive Commentary, Art. 13, § 1 Tex.Const. This section first appeared in the Constitution of 1845 (Art. 13, § 4), its purpose being to make certain that the title to property which had reverted to the state under previous governments was not disturbed by Texas entering the Union. It appeared in the Constitution of 1861 (Art. 13, § 4), but was changed in both of the recon-

struction constitutions. It was re-adopted by the Constitutional Convention of 1875 without debate. This constitutional provision is not self-executing, it requires some act of the legislative to put it in motion and make it final by judicial determination. Article XIII, § 1–7 were repealed August 5, 1969.

and restore their land to the mass of vacant domain." (Emphasis supplied).

There is no summary judgment evidence that the Portilla's lands have been judicially forfeited. The defendants contend that there had not been even any "implementing legislation" providing a method for determining what lands may have been forfeited or escheated. In *Swift v. Herrera,* 9 Tex. 263, 279 (1852), the court stated:

"The constitution of the State, in section 4, article 13, requires the legislature to provide a method for determining what lands may have been forfeited and escheated. No law prescribing the mode of ascertaining forfeitures has yet been adopted."

See also *Hancock v. McKinney,* 7 Tex. 384, 455 (1851); *Sabriego v. White,* 30 Tex. 576, 589 (1868); *Kilpatrick v. Sisneros,* supra, 23 Tex. at 133; *Wiederanders v. State of Texas,* 64 Tex. 133, 138 (1885); *Branham v. Minear,* 199 S.W.2d 841 (Tex.Civ.App.— Eastland 1947, writ ref'd n. r. e.); *Airhart v. Massieu,* 98 U.S. 491, 25 L.Ed. 213 (1855).

There being no "ipso facto forfeiture" under Section 8 of the General Provisions of the Constitution of the Republic of Texas, nor under Art. 13, § 1, of the Texas Constitution, there would have to be some type of judicial determination, of which there is none. No prior proceeding has been taken in this case to declare the land forfeited. The State, however, contends that the Legislature did enact the necessary legislation such being in the form of Articles 4410[2] and 5420[3], Tex.Rev.Civ.Stat.Ann. (1966). Whether or not these two articles represent "implementing legislation" or not, becomes immaterial when the State of Texas is faced with the fact that on August 5, 1969, Article XIII section 1 was repealed, leaving the State without a basis for claiming the allegedly invalid Mexican land grants or lands supposedly ripe for forfeiture.

The State next contends that the Portillas forfeited their titles for failure to pay the government dues owed on the land as required by law. Notwithstanding the fact that we have already held that a presumption of payment exists after a lapse of approximately 130 years, the State's contention is without merit for still a further reason.

Under Article 22 of the Colonization Laws of March 24, 1825 (1 Gammel, Laws of Texas, p. 102), the law required that new colonist pay to the State (of Coahuila and Texas) the sum of $30.00 for each lot of pasture land. The payment for such was to be made in less than 6 years from the date of the grant in 3 equal installments, the first at the expiration of the fourth year, and the others at the expiration of the fifth and sixth years, under penalty of forfeiting their lands should they neglect the payment of any one of these installments. However, by Section 24 of the Laws of the Republic of Texas of 1837 (1 Gammel, Laws of Texas, p. 1413), said time for payment was extended to six months after the opening of the land office, by providing that such persons shall pay, or cause such payment to be made, to the president of the board of land commissioners of the county where such land is situated. By Section 39, the several land offices commenced operation in February 1838. The State now claims that the Portillas failed to satisfy this requirement in that no payment for their grants was

---

**2.** Art. 4410 Escheats—The Attorney General shall institute and prosecute, or cause to be instituted and prosecuted, all suits and proceedings necessary to recover for and on behalf of the State all properties, real, personal or mixed, that have escheated or may escheat to the State under the laws of the State.

**3.** Art. 5420 Adverse Claimant; suit—When any public lands are held, occupied, or claimed by any person, association or corporation, adversely to the State, or to any fund or when lands are forfeited to the State for any cause, the Attorney General shall institute suit therefor, for rent thereon, and for any damages thereto. Any and all suits brought by the State under this Article and under the preceding Article must be brought in the county in which the land or any part thereof may lie. Nothing in this Act shall affect or apply to any suit or suits pending at the time this act shall become effective.

made until August 15, 1845 more than six years after the opening of the general land office, and that payment was made by James Power in the nature of his promissory note. The State makes two claims: 1) the payment was too late and 2) the delivery of promissory notes did not constitute payment, particularly in the absence of evidence that the notes were ever paid.

■ First, with respect to the payment being late, the State's summary judgment evidence shows that the land commissioner accepted James Power's promissory notes in 1845. There was no proceeding prior to 1845 by either the State of Coahuila and Texas or the Republic of Texas to forfeit the Portilla grants for non-payment of dues. In 1845 the land commissioner accepted payment for the Portilla lands from James Power. No proceedings by the State of Texas have been brought to forfeit the Portilla lands until the present time, after a lapse of 130 years. From such a lapse of time, the presumptions of payments arises against the state. See *Harris v. O'Connor,* supra, 185 S.W.2d at p. 1015.

■ With respect to the State's claim that Power's promissory notes were not proper currency, we find such is also without merit. By "An Act" (1 Gammel, Laws of Texas, pp. 1309–1310), the issuance of promissory notes by the President was authorized. The Act in Section 3 provides as follows:

"Sec. 3. Be it further enacted, That the said notes at any time before or after maturity, shall be considered as cash, and shall be received as cash for all dues owing or coming to the Government."

See also 1 Gammel, Laws of Texas, pp. 1492, 1493; 2 Gammel, Law of Texas, pp. 81, 82; 2 Gammel, Laws of Texas, p. 310; 2 Gammel, Laws of Texas, p. 323. The State's exhibit No. 52, being a receipt from the chief clerk of the General Land Office, recites that the sum of thirty dollars in promissory notes from James Power was received for payment of one league of land granted to Felipe Rogue Portilla. Such

promissory notes were recognized as a method of payment.

We have reviewed the entire summary judgment record, as voluminous as it is. We have carefully studied all of the State's claims that a vacancy exists. We are convinced that the trial court was correct in entering the second summary judgment, this time against the State of Texas.

The evidence, the law, and time itself, perfects the title to the lands under attack by the State of Texas. In *United States v. Devereux,* supra, the court said:

". . . 'If time,' said Lord Plunkett, 'destroys the evidence of title, the law has wisely and humanely made length of possession a substitute for that which has been destroyed. He comes with a scythe in one hand to mow down the muniments of our rights, but in his other hand the lawgiver has placed an hourglass, by which he metes out incessantly those portions of duration which render needless the evidence he has swept away. . .' "

Judgment of the trial court is affirmed.